CRAWFORD COUNTY, Arkansas *v.*
Dottie JONES

CA 04-469                                      209 S.W.3d 381

Court of Appeals of Arkansas
Opinion delivered June 1, 2005

[Rehearing denied June 29, 2005.]

162

*Bachelor & Newell*, by: *C. Burt Newell*, for appellant.

*The Baker Law Firm, P.L.L.C.*, by: *Rinda Baker*, for appellee.

DAVID M. GLOVER, Judge. This is a wrongful-termination case. Appellant Crawford County, Arkansas (County), appeals from a jury verdict in favor of appellee Dottie Jones for breach of contract. Jones cross-appeals from the trial court's granting of the County's motion for directed verdict on her claims of outrage and violation of the Arkansas Whistle-Blower Act, as well as the denial of her request for attorney's fees. We affirm on direct appeal; we affirm in part and reverse and remand in part on cross-appeal.

## *Background*

In 1979, Jones went to work in the Crawford County Assessor's Office as an appraiser. In November 1999, the County hired Accurate Mapping Company to conduct reappraisals in accordance with Act 1185 of 1999. Accurate Mapping agreed to use appraisers from the assessor's office for the reappraisals, and Jones was assigned to work on the reappraisal under Accurate Mapping's supervision. On July 3, 2000, Accurate Mapping released Jones back to the assessor's office, due to alleged complaints against Jones. On that same day, the assessor, Dianna Faucher, terminated Jones based on the same complaints.

The County adopted an "Employee Policy Handbook" (handbook), effective July 11, 2000. This handbook replaced an earlier policy ordinance adopted in 1993 and later amended. The handbook provided, in pertinent part:

> All County employees are permanent employees with a property right in their employment. Each County employee has a substantial expectancy of continued employment until the employee voluntarily resigns or "just cause" for reduction or removal of pay or position is proved by the County at a pre-deprivation hearing or a property interest hearing (a "grievance hearing") which will be provided if the affected employee requests a property right hearing in the time and manner required by this policy. . . .

"Just cause" for the reduction or removal of pay or position was defined to include "any reason rationally related to the effectuation of a legitimate County objective." The handbook provided that an elected official or departmental supervisor may lay off an employee whenever it is necessary by reason of non-appropriation of funds or work, or by reason of a bona fide abolishment of or change in the duties of a position, or when the department is reorganized and the

need for the position is eliminated. However, the handbook, in discussing layoffs, also provided as follows:

> No employee with permanent employee status is to be separated by lay off while there are extra help, temporary, seasonal or probationary employees serving in the department in the same or equal or lower-level position for which regular-status employee or employees are qualified and available to reassignment.

> In determining the order of lay off of employees with regular status, the elected official may consider, on a consistent and equitable basis, such factors as seniority (the length of a County employee's continuous service with the County since the last date of hire), work record, conduct and qualifications.

The supervisory official had the burden of proving "just cause" for the supervisory official's intended discipline or dismissal of the employee. In the event that an employee was involuntarily terminated for any reason, other than as a result of disciplinary action, attempts were to be made to give the affected employee at least two weeks' notice.

Jones pursued the handbook's grievance procedure and was reinstated effective August 1, 2000. Then, on August 2, 2000, Faucher notified Jones that she was being laid off effective August 4, 2000. Jones again attempted to utilize the grievance procedure, but her request for a hearing was denied on August 15, 2000.

Jones filed suit against the County and Faucher, individually and in her official capacity, alleging causes of action under the Arkansas Whistle-Blower Act, breach of contract/wrongful termination, and outrage. The County and Faucher denied the allegations of the complaint. Jones took a nonsuit as to Faucher prior to trial.

### The Evidence

Sharon Partain, a Crawford County Justice of the Peace, testified concerning the adoption of the handbook. She also discussed the contract between the County and Accurate Mapping, stating that, under the contract, Accurate Mapping had the right to use County employees with Accurate Mapping reimbursing the County for the employees' salaries and benefits. She also noted that Accurate Mapping had the right to return the employees to the County if they did not work out, and there were

provisions for such instances. As an example, she stated that employees were supposed to be given two weeks to rectify any problems and, if they had not rectified the problem, then they were to be returned to the County office. She also stated that Accurate Mapping could not terminate County employees. Partain stated that, at the grievance hearing, Faucher indicated that Accurate Mapping had returned Jones to the County, but she did not have a position for her. She also stated that, at the same grievance hearing, Faucher admitted that she did not follow proper procedures with regard to Jones. Partain also admitted that an elected official such as Faucher should be able to handle the day-to-day employment issues in his or her office unless there was something specifically contained in the handbook. She also expressed the opinion that, because of Jones's seniority, she should have been rehired by Faucher, and, if there was no slot available, someone with less seniority should have been laid off. She admitted that the handbook provided for layoffs and that the laid-off employee was not entitled to a hearing.

Partain testified that Jones discussed misdeeds in the assessor's office with her on at least one occasion. She was uncertain whether the conversation took place prior to the grievance hearing and later testified that the conversation took place on the night of the hearing. She also stated that she was aware that Jones had similar discussions with some of the other members of the quorum court.

Ronnie Dale, a former appraiser for the County, testified that Faucher told him that Jones had been terminated because Accurate Mapping had received complaints about Jones and did not want Jones working for them and that she had no position available for Jones. He also stated that after Jones's termination, Faucher asked him to sign a statement providing that, if Accurate Mapping released him or another County employee back to the County, the employee would be laid off because the assessor's office had no positions open. Dale also testified to instances when Faucher lowered appraisals on properties he had appraised, implying that the reductions were improper. He also stated that, shortly after Accurate Mapping started the reappraisal process, he spoke with Faucher about some problems and encouraged her to do something about Accurate Mapping's not performing its duties under the contract as it was supposed to do. Dale testified that, with the possible exception of a part-time slot in the personal-

property section, he was not aware of any open positions in the assessor's office at the time Jones was laid off.

Patty Hill, the Crawford County Clerk, testified that in the year 2000 there was one part-time person employed in the assessor's office, who eventually became a full-time employee in April 2001. She stated that in the year 2001 there were four other part-time employees in the assessor's office. She also stated that there are no appraisers currently employed by the County.

Hubert Staggs testified that he spoke with Faucher after his tax bill had doubled following Jones's visit to reappraise his property. When Staggs discussed the matter with Faucher, he was told that he had been "Dottie-tized."

Connie Byerle, an abstractor and a data-entry person in the assessor's office, testified that she was hired as a part-time employee in July 1988 before becoming full-time in August 1999. She was not aware of any full-time positions available in the assessor's office in August 2000. She stated that she declined to become an appraiser in August 2000 because she would have become an employee of Accurate Mapping and not the County. She testified about examples of real property belonging to Faucher or her family not being assessed at full value. She testified that, shortly after Jones's reinstatement, she and other employees had a meeting during which they told Faucher that, if she created another position for Jones, the other employees were going to quit their jobs.

Lezlie Williamson, the project manager for Accurate Mapping, testified that the County's appraisers were not familiar with the requirements of Act 1185 of 1999. She also testified that she and others received complaints about Jones. At one point in her testimony, Williamson indicated that the complaints concerning Jones had been received in March while, at another point, she indicated that the complaints had been received during June. She testified that she had the impression that Faucher was trying to protect Jones's job by not promptly relaying complaints. She also testified that, after Jones received a reprimand about her performance from Carolyn Walker, the president of Accurate Mapping, her performance improved. However, she also testified that, when she told Walker about all the complaints, Walker decided to release Jones back to the County.

Williamson indicated that Don James was terminated because he was "windshield appraising." She was not aware if Jones was the person who disclosed this information to Faucher. She also

admitted that "windshield appraising" was a violation of both the contract with the County and state law. She also stated that the contract between the County and Accurate Mapping provided for a ten-day period during which appraisers could correct any deficiencies in their job performance. She admitted that Jones was not given a chance to correct any of the complaints received in June 2000. Williamson stated that she conducted the appraisal on Faucher's personal residence.

Dottie Jones testified that she was hired in the assessor's office in 1979 and was a level-three appraiser at the time she was laid off. She admitted that, when Accurate Mapping began the reappraisal, there was a meeting to discuss how things would be done and that they would be supervised by Accurate Mapping. She also admitted that she received a letter from Carolyn Walker in March 2000 informing her that Accurate Mapping had found her performance to be deficient. She also stated that Lezlie Williamson occasionally accompanied her when she made appraisals, keeping records of her work. Jones stated that it was her understanding that she was still a County employee after Accurate Mapping began the project. She also stated that she received a letter from Lezlie Williamson stating that her performance had improved. Jones stated that she never received any other complaints until July 2000, after she had asked for a couple of days off. She described receiving a phone call from Faucher informing her that she was being laid off after Accurate Mapping had returned her to the County. She described the grievance hearing and Faucher stating that there had been some complaints about Jones and that she (Faucher) did not have a slot for Jones. She also stated that Faucher admitted not following the handbook's procedures in the layoff. Jones listed possible jobs she could do in the assessor's office and suggested that she was terminated because she would tell Faucher of instances when the assessor's office was not following state law, such as the need to have mobile-home decals.

Jones testified that she told Faucher that Don James was "windshield appraising." She stated that Faucher responded that she could not do anything about it. Jones testified that she informed quorum court members such as Giles Osborne, Doyle Johns, and Sharon Partain of the improprieties in the assessor's office. She stated that the conversations with Osborne and Johns occurred prior to the grievance hearing.

Jones testified that she disagreed with Williamson that her work was not up to standard. She also stated that, at the time that

she was laid off, there were temporary positions available in the assessor's office. She also stated that she told Faucher of some of the problems because it was her duty to inform her boss. She stated that the conversation with Faucher regarding her discussions with the justices of the peace occurred prior to July 3. Jones also described her mental condition after being laid off as being "a pretty bad depression."

Carolyn Walker, president of Accurate Mapping, testified as to the contract between her company and the County. She testified that the work-in-kind program was a means by which Accurate Mapping would use the County's appraisers under Accurate Mapping's supervision. Walker testified that Faucher, as assessor, had no input on where the appraisers went or what they did because Accurate Mapping controlled the day-to-day activities of the appraisers and reimbursed the County for their salaries. Walker stated that Jones was not pleased that Accurate Mapping held the contract and that she (Jones) felt she knew how to appraise property. Walker described Jones as not always willing to listen to instructions from the project manager about the use of new procedures in the reappraisal. She also described Jones as having a problem with Donald James. Walker described writing a letter, dated March 17, 2000, stating that Accurate Mapping found that Jones and Ronnie Dale were not properly performing their jobs and giving them ten days to correct the situation or they would be returned to the County. She testified that, after the letter was written, Lezlie Williamson advised her that Jones was improving her performance for a time before getting more complaints. She also described a letter to Faucher, dated June 27, 2000, informing Faucher of Accurate Mapping's decision to dismiss Jones because complaints about Jones were being received on a daily basis from both the private sector as well as Crawford County officials. Walker stated that she believed that there was just cause to terminate Jones. She admitted that there were problems with the reappraisal and that Accurate Mapping and the County were found to be out of compliance. She also stated that she never terminated Jones because all she could do was return her to the County.

Diana Faucher, the Crawford County Assessor, testified that Act 1185 of 1999 required reappraisals to be done differently than in the past. She stated that the State had a list of contractors to choose from to conduct the reappraisal and that Accurate Mapping was chosen because they would use the work-in-kind program and use County appraisers. At the time of the reappraisal, she stated

that there were four field appraisers for the County and that, by the end of the year 2000, all of them had left County employment. Faucher stated that there were several meetings between her staff and Carolyn Walker and Lezlie Williamson of Accurate Mapping during which the staff was told what would be expected of them. She stated that Accurate Mapping would be reimbursing the County for the appraisers' salaries and benefits but that they were under the supervision of Accurate Mapping, who was responsible for the contract. Faucher also stated that she informed the employees that, if they were laid off or returned to the County, she had no choice but to lay them off because the reappraisal company was doing their job. She also stated that she was told by several appraisers that, if they were released from Accurate Mapping, they were not going to be silent. She stated that the appraisers did not like the fact that Accurate Mapping was managing their work.

Faucher testified that, on occasion in 2000, she received complaints from citizens concerning Jones. She also stated that she delayed informing Lezlie Williamson about those calls. She also testified about receiving two letters from Carolyn Walker concerning Jones and her release from the contract. She described her call to inform Jones of the layoff and of possible work in Sebastian County. She also stated that she informed Jones that she could request a grievance hearing. She stated that the result of the grievance hearing was that she was instructed to rehire Jones. Faucher stated that she sent Jones a letter laying her off for lack of work and because there was no position available. Faucher stated that she never fired Jones nor knew why Jones asked for the grievance hearing. She asserted that Jones and the other appraisers knew that they would be laid off if they were returned to the County. Faucher also denied terminating Jones because of the complaints. Faucher stated that she testified at the grievance hearing that there was no position available for Jones. Faucher admitted that Connie Byerle was still a probationary employee at the time Jones was laid off. She indicated that her staff would not have been happy if she had tried to make a new position for Jones or laid somebody else off for Jones to have a position. Faucher stated that she believed she followed the handbook in Jones's layoff. Faucher also admitted that she did not tell Jones about the complaints that she received.

## The Trial Court's Decision

At the close of Jones's case, the trial judge directed verdicts in favor of the County on her Whistle-Blower Act and outrage

claims. The jury returned a verdict in Jones's favor on the breach-of-contract claim and awarded damages of $149,370. Following trial, the County filed a motion for judgment notwithstanding the verdict, alleging that there was insufficient evidence to sustain the jury's verdict. Judgment was entered on September 30, 2003. The motion for judgment notwithstanding the verdict was denied on October 10, 2003. Jones also filed a motion for attorney's fees on October 31, 2003. The trial court denied the fee motion by order entered on December 8, 2003. The County filed its notice of appeal from both the judgment and the order denying its motion for judgment notwithstanding the verdict on November 3, 2003. Jones filed a notice of cross-appeal from the directed verdicts on her whistle-blower and outrage claims on November 17, 2003. She amended her notice of cross-appeal to include the denial of her motion for attorney's fees.

## Direct Appeal

For its sole point on appeal, the County asserts that the jury's verdict was against the preponderance of the evidence. Our standard of review on motions for judgment notwithstanding the verdict was enunciated in *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002), where the supreme court stated:

> [I]n reviewing the denial of a motion for judgment notwithstanding the verdict, we will reverse only if there is no substantial evidence to support the jury's verdict and the moving party is entitled to judgment as a matter of law. Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. It is not the appellate court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. In reviewing the sufficiency of the evidence as being substantial on appellate review, we need only consider the testimony of the appellee and the evidence that is most favorable to the appellee. Circumstantial evidence may meet the substantial-evidence test.

*Lee*, 348 Ark. at 719, 74 S.W.3d at 644-45 (citations omitted).

In Arkansas, the general rule is that an employer or an employee may terminate an employment relationship at will. *See Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991);

*Gladden v. Arkansas Children's Hosp.*, 292 Ark. 130, 728 S.W.2d 501 (1987). There are two basic exceptions to the at-will doctrine: (1) where an employee relies upon a personnel manual that contains an express provision against termination except for cause; (2) where the employment agreement contains a provision that the employee will not be discharged except for cause, even if the agreement has an unspecified term. *Gladden, supra; see also Ball v. Arkansas Dep't of Cmty. Punishment*, 340 Ark. 424, 10 S.W.3d 873 (2000).

■ Here Jones claims that the County, acting through Faucher, laid her off in violation of the handbook. The County argues that it made the decision through the quorum court hearing to rehire Jones, but that Faucher, acting individually, did not follow the handbook in Jones's layoff. However, the County does not explain why Faucher's actions cannot be attributed to the County when she was acting in her official capacity at the time she terminated Jones. Jones worked for the County and Faucher, as an individual, did not have any authority to terminate Jones; she could do so only in her capacity as assessor. The assessor is a county officer. Ark. Code Ann. §§ 14-14-703(a)(2), 14-14-1301(a)(4) (Repl. 1998). A county is bound by the acts of its lawfully constituted officers. *See Pierce County v. Washington Navigation Co.*, 27 P.2d 569 (Wash. 1933); 20 C.J.S. *Counties* § 122 (1990). Both the United States Supreme Court and the Arkansas Supreme Court have held that official-capacity suits generally represent but another way of pleading an action against the entity of which the officer is an agent. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *City of Marianna v. Arkansas Mun. League*, 291 Ark. 74, 722 S.W.2d 578 (1987).

■ The jury was instructed that one of the elements Jones was required to prove was that the County failed to follow the guidelines set forth in the handbook in Jones's termination. Jones presented evidence that, at the time she was laid off, there were part-time and probationary employees working in the assessor's office; that the handbook provided that part-time or probationary employees were to be laid off prior to full-time employees' being laid off; that for terminations other than disciplinary actions, the employee was to be given two weeks' notice; and that Faucher notified her on August 2nd that she would be laid off on August 4th. Further, Jones presented evidence that there were other jobs

she could do in the assessor's office besides appraisals. This constitutes substantial evidence to support the jury's verdict.

We affirm on this point.

## Cross-Appeal

Jones raises three points on cross-appeal: that the trial court erred in directing a verdict against her on her Arkansas Whistle-Blower Act claim; that the trial court erred in directing a verdict against her on her outrage claim; and that the trial court erred in denying her motion for attorney's fees. In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Curry v. Thornsberry*, 354 Ark. 631, 128 S.W .3d 438 (2003); *Woodall v. Chuck Dory Auto Sales, Inc.*, 347 Ark. 260, 61 S.W.3d 835 (2001); *Lytle v. Wal-Mart Stores, Inc.*, 309 Ark. 139, 827 S.W.2d 652 (1992). A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Mankey v. Wal-Mart Stores, Inc.*, 314 Ark. 14, 858 S.W.2d 85 (1993). Stated another way, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000); *Wal-Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991). Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Howard v. Hicks*, 304 Ark. 112, 800 S.W.2d 706 (1990).

■ In her first point on cross-appeal, Jones argues that the trial court erred in granting a directed verdict on her claim under the Arkansas Whistle-Blower Act, Ark. Code Ann. §§ 21-1-601 through 609 (Repl. 2004). The Whistle-Blower Act provides protection for public employees who report to appropriate authorities the violation of law or the waste of public funds. Such whistle-blowers who are punished by the public employer are authorized to seek actual damages and injunctive relief. In order to prevail in an action brought under the Act, Jones was required to establish, by a preponderance of the evidence, that she had suffered an adverse action because she or a person acting on her behalf engaged or intended to engage in an activity protected under the Act. Ark. Code Ann. § 21-1-604(c). An "adverse action" means

to discharge, threaten, or otherwise discriminate or retaliate against a public employee in any manner that affects the employee's employment, including compensation. Ark. Code Ann. § 21-1-602(1).

The trial court did not specify a reason for granting the directed verdict. In the argument on the motion for a directed verdict on the Whistle-Blower Act claim, the County argued that Jones did not report the alleged wrongful acts to an "appropriate authority," as that term is used in the Act. However, Jones testified that she reported the incidents to three members of the quorum court and to Faucher. We hold that these were "appropriate authorities" for Jones to report alleged violations. The county government's legislative powers are vested in the quorum court. Ark. Code Ann. § 14-14-502(a)(1) (Repl. 1998). The Act specifically defines "appropriate authority" as including a member of the governing body. Ark. Code Ann. § 21-1-602(2)(A)(ii). Therefore, the directed verdict cannot be sustained on the premise that Jones did not report the wrongdoing to an "appropriate authority."

■ There was also some discussion by the trial court that the remedies in the breach-of-contract and violation of the Whistle-Blower Act claims were the same. If this was the basis for the directed verdict, it was error. Jones was entitled to have the two claims considered by the jury if both were supported by substantial evidence. The doctrine of election of remedies bars more than one recovery on inconsistent remedies, but the doctrine does not limit the number of causes of action asserted by a plaintiff to be submitted to the jury. *Sexton Law Firm, P.A. v. Milligan*, 329 Ark. 285, 948 S.W.2d 388 (1997); *Cater v. Cater*, 311 Ark. 627, 846 S.W.2d 173 (1993); *Westark Specialties v. Stouffer Family Ltd.*, 310 Ark. 225, 836 S.W.2d 354 (1992).

■ Here, Jones submitted evidence of several possible violations of state law or the contract between the County and Accurate Mapping: the failure to have mobile home decals, one appraiser conducting "windshield appraisals," Faucher improperly lowering appraisals on certain property after the time for her to do so had expired, and Faucher improperly allowing individuals to claim a homestead exemption without proof of entitlement. Jones also presented evidence that these matters were discussed with quorum court members, as well as with Faucher, that there were other positions available in the assessor's office, and that Faucher and Lezlie Williamson were seen together at her grievance hear-

ing, allegedly fabricating complaints against Jones. This testimony, if believed by a jury, would be sufficient to survive a motion for directed verdict. Therefore, we reverse and remand for a new trial on this point.[1]

In her second point on cross-appeal, Jones argues that the trial court erred in directing a verdict against her on her outrage claim. The supreme court has described the elements of a tort-of-outrage claim:

> To establish an outrage claim, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. This court gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases. Merely describing the conduct as outrageous does not make it so. Clear-cut proof, however, does not mean proof greater than a preponderance of the evidence.

*McQuay v. Guntharp*, 331 Ark. 466, 470-71, 963 S.W.2d 583, 585 (1998) (citations omitted). Our courts have taken a strict approach in determining the validity of outrage cases and recognized that "the tort of outrage should not and does not open the doors of the courts to every slight insult or indignity one must endure in life." *Travelers Ins. Co. v. Smith*, 338 Ark. 81, 89, 991 S.W.2d 591, 595 (1999).

The question is whether there was substantial evidence of outrageous conduct on the part of the County. Merely describing conduct as outrageous does not make it so. *Fuqua v. Flowers*, 341 Ark. 901, 20 S.W.3d 388 (2000); *Crockett v. Essex*, 341 Ark. 558, 19 S.W.3d 585 (2000).

Four cases where the tort of outrage was alleged and which arose out of the workplace appear pertinent. In *Faulkner v. Arkansas Children's Hospital*, 347 Ark. 941, 69 S.W.3d 393 (2002), the

---

[1] In so holding, we note that Jones would not be entitled to recover again for lost wages and benefits because she has recovered those same benefits in the breach-of-contract claim.

plaintiff presented facts indicating strained working relationships, a deliberate attempt to undermine her authority, false accusations of shoddy work, false accusations and rumors of mental illness, and, eventually, her being placed on leave. The supreme court affirmed the dismissal of the complaint under Ark. R. Civ. P. 12(b)(6), noting that the plaintiff had not alleged any conduct that was beyond all possible bounds of human decency and utterly intolerable in a civilized society so as to rise to the level of outrage.

In *Smith v. American Greetings Corp.*, 304 Ark. 596, 804 S.W.2d 683 (1991), the plaintiff alleged that he had a dispute with his shift leader while at work, and after work, he tried to discuss the matter, but the shift leader hit him. He alleged that he was fired the next day because management asserted that he had provoked his shift leader into a fight. In that case, the supreme court affirmed dismissal of the outrage claim under Ark. R. Civ. P. 12(b)(6), even though the plaintiff's boss had actually been physically violent toward him. Likewise, in *Sterling v. Upjohn Healthcare Services, Inc.*, 299 Ark. 278, 772 S.W.2d 329 (1989), the supreme court upheld the trial court's grant of summary judgment to the defendant, despite the plaintiff's employer's unfounded assertions that the plaintiff was drunk at work, the employer's attempts to undermine the plaintiff, and the employer's eventual violent rhetoric regarding the plaintiff.

Only once has our supreme court held that a plaintiff met the standard for proving the tort of outrage in an employee-discharge case. In *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984), an employer interrogated an employee suspected of theft at thirty-minute intervals for most of a day, denied him prescription medication when he was under obvious stress, and threatened him with arrest. In holding that there was substantial evidence to support the jury verdict for outrage, the supreme court placed special emphasis on the fact that, even though the employer knew of the employee's lower-than-normal emotional stamina, it refused to permit him to take his medication during the interrogation.

In the present case, Jones's argument focuses more on *how* the County's actions affected her rather than on *whether* those actions rose to the level of outrage. She does not argue specific evidence of actions on behalf of the County that rise to the level of outrage, other than the testimony of Hubert Staggs. Staggs testified that he spoke with Faucher after his tax bill had doubled following Jones's visit to reappraise his property. When Staggs discussed the

matter with Faucher, he was told that he had been "Dottie-tized." This does not meet the high standard required for outrage cases. Accordingly, we affirm on this point.

In her third point on cross-appeal, Jones argues that the trial court erred in not granting her motion for attorney's fees. Jones based her motion of Ark. Code Ann. § 16-22-308 (Repl. 1999), the statute allowing fees in actions for breach of contract, and sought fees of $16,511.92. The County argued that this was not a breach-of-contract case. Although the supreme court held in *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), that an action for wrongful discharge in violation of a personnel handbook sounds exclusively in contract, we affirm on the basis that the motion was untimely.

In *Norman v. Norman*, 347 Ark. 682, 66 S.W.3d 635 (2002), the supreme court held that a motion for fees filed more than fourteen days after entry of judgment was untimely under Arkansas Rule of Civil Procedure 54(e). Here, it is undisputed that the judgment was entered on September 30, 2003, and Jones did not file her fee request until October 31, 2003. Therefore, *Norman* clearly controls on this issue, and the fee request was untimely. *See also Morehouse v. Lawson*, 90 Ark. App. 379, 206 S.W.3d 295 (2005). Even if the time is measured from the denial of the County's motion for judgment notwithstanding the verdict, the fee motion is still untimely because it was filed twenty-one days after the order denying the motion was entered.

Affirmed on direct appeal; affirmed in part and reversed and remanded in part on cross-appeal.

ROBBINS and NEAL, JJ., agree.