2010 Ark. App. 458

**AGRACAT, INC. and Agracat, Incorporated, Appellants**

v.

**AFS–NWA, LLC, d/b/a Montana Tractors; The Estate of J.B. Hunt, Deceased; Charles Goforth; Dan Downing; Downing and Associates, Inc.; Outsource Investments, LLC; J.B. Hunt, LLC; and J.B. Hunt Revocable Trust, Appellees.**

No. CA 09–1095.

Court of Appeals of Arkansas.

June 2, 2010.

David G. Nixon, Theresa L. Pockrus, The Nixon Law Firm, Cheslee Mahan, Fayetteville, for appellants.

Kenneth R. Shemin, J. Jason Boyeskie, Shemin Law Firm, PLLC, Rogers, for appellees.

LARRY D. VAUGHT, Chief Judge.

This case arises from a suit filed by appellants Agracat, Inc., and Agracat Incorporated (Agracat) against appellees for breach of fiduciary duty, fraud, interference with a business expectancy, and civil conspiracy. Agracat alleged that appellees parlayed a financing and joint-venture agreement into a take-over of Agracat's relationships with its employees, dealers, and suppliers. During a jury trial on Agracat's complaint, appellees moved for a directed verdict on all counts at the close of Agracat's proof. The circuit court denied the directed verdict in part, ruling that Agracat had presented substantial evidence of appellees' liability on the various causes of action. However, the court granted the directed verdict on the ground that Agracat failed to offer proof from which the jury could compute damages. On appeal, Agracat argues that the circuit court erred in granting the directed verdict and in excluding certain evidence. We agree that the directed verdict must be reversed.

We recite the following facts in the light most favorable to Agracat. *See Crawford County v. Jones,* 91 Ark. App. 161, 209 S.W.3d 381 (2005). Three Arkansas businessmen formed Agracat in 1999 for the purpose of importing tractors into the United States and selling them through a network of dealers. The business grew quickly, and Agracat financed its inventory with several bank loans. Jim Steele, Agracat's president and one of its founders, would later testify that the burden of those loans caught up with Agracat after September 11, 2001, when orders from dealers evaporated, leaving Agracat with unsold inventory, unmet personnel expenses, and unpaid debts. Agracat sought financing from private sources, and the company's outside accountant, appellee Dan Downing, took an interest in the situation. Downing agreed on September 11, 2002, to forego $26,569 in unpaid accounting fees in exchange for 18,193 shares of Agracat's preferred stock (convertible to 54,579 shares of common stock). Downing also helped Agracat obtain financing from two other northwest Arkansas business-

men, appellee Charles Goforth and the late J.B. Hunt, whose estate and revocable trust are appellees herein.

In the latter part of 2002, Downing, Goforth, and Hunt formed AFS–NWA, LLC (AFS) as a vehicle to provide inventory financing to Agracat. AFS executed a three-year operating agreement with Agracat that essentially gave AFS nine percent of Agracat's sales revenue in exchange for furnishing Agracat with a $2,000,000 letter of credit to facilitate inventory acquisition. The parties expressed confidence in Agracat's future, as shown by the agreement's statement that Agracat would "position itself for a public offering after three years from the contract date." The parties also considered the possibility a few months later that appellees would purchase an interest in Agracat. In May 2003 Steele told Downing that he would sell fifty-one percent of Agracat for $1,350,000, or forty percent for $1,200,000. However, the sale did not take place.

Agracat's outlook improved in 2003, but problems persisted at the company. A number of creditors remained unpaid, and Agracat's dealers found it difficult to obtain product using the company's outmoded floor-plan arrangement. Further, in the summer of 2003, conflict arose between Agracat and AFS over missing inventory and Agracat's deposit of approximately $98,000 in sales proceeds into its own bank account rather than AFS's account, as required by the operating agreement. As a result, AFS began to monitor Agracat's operations more closely and became more intimately involved with Agracat's accounting procedures, personnel matters, and expense records. Nevertheless, the parties apparently remained optimistic about Agracat's chances for success. Steele spearheaded an effort to acquire new floor-plan financing from several large companies, and Downing told one of the companies that, if adequate capital were in place, Agracat could achieve a monthly estimated profit of $48,000 before taxes. Additionally, Downing's associate prepared a document predicting that AFS would earn approximately $4,200,000 in a year's time from its nine percent of Agracat sales.

In August or September of 2003, Steele met with Downing, Goforth, and Hunt to discuss the floor-plan situation. According to Steele, Hunt wrote him a check at the meeting for $1,000,000, which he offered in exchange for Steele resigning from Agracat and starting a new tractor company with Hunt. Hunt also offered Steele a nine-percent interest in the new company. Steele declined the offer in deference to his colleagues who had helped him form Agracat.

Efforts continued to finalize the floor-plan financing arrangements, but in late 2003, AFS's principals told Steele that they would not sign off on the arrangements or accept any further inventory shipments from overseas unless Agracat signed a new, three-year operating agreement. The agreement, executed in November 2003, gave AFS far greater involvement with Agracat's inventory, sales, and accounting procedures than the previous agreement and basically reduced Agracat's participation in the company to selling inventory and providing service and warranty work. The agreement also provided that, upon its termination, AFS had the option to acquire fifty-one percent of Agracat's 17,851,527.62 shares of common stock ($0.001 par value) for $1000, though the option was never exercised.

In the early part of 2004, AFS became more intertwined with Agracat's operations by advancing money to pay bills; making the decision to move Agracat to a new location; requesting job descriptions

from Agracat's employees and seeking information about inventory purchases and sales forecasts; making decisions regarding Agracat's purchase of computer equipment; and weighing in on matters such as the payment of commissions, pay raises, and hiring and firing of employees. J.B. Hunt also began stating to Steele and others that "we've got fifty-one percent control and we're going to move forward." Additionally, AFS indicated to one of Agracat's suppliers that AFS was "taking" Agracat's employees. Downing told another supplier that Agracat was "near to filing bankruptcy."

On March 5, 2004, Agracat decided to file bankruptcy. Within a very short period, AFS began to operate Montana Tractors using many of Agracat's employees, salespeople, dealers, and suppliers. When Steele asked Hunt "what they would take for their interest," Hunt replied $6,900,000. Steele could not afford that price and could not regain the business relationships lost to AFS and Montana Tractors. AFS representatives would later acknowledge that Agracat's former relationships had value to AFS, though they could not say how much value.

Based on this series of events, Agracat sued AFS and the other appellees for breach of fiduciary duty, fraud, interference with a business expectancy, and civil conspiracy.[1] Agracat's complaint alleged that appellees had acted in their own interest to Agracat's detriment and that appellees represented that they were planning a joint venture with Agracat but instead "took over" Agracat's relationships with its employees, dealers, and suppliers. The case was tried to a jury beginning March 20, 2009.

During Agracat's case-in-chief, it presented no expert testimony nor any testimony from Steele or other Agracat representatives as to the value of Agracat's business relationships. Consequently, appellees moved for a directed verdict at the close of Agracat's case on the ground that Agracat failed to place a dollar figure on any alleged damages. Agracat responded that it had produced evidence such as Downing's acquisition of stock shares or Steele's offers to sell the company, which would allow the jury to calculate the amount of damages. The circuit court disagreed and directed a verdict for appellees. This appeal followed.

In determining whether a directed verdict should have been granted by the circuit court, we review the evidence in the light most favorable to the party against whom the verdict was sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Crawford*, 91 Ark. App. at 172, 209 S.W.3d at 390. A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Id.*, 209 S.W.3d at 390. Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.*, 209 S.W.3d at 390.

Agracat contends that, because its business relationships were the lifeblood of the company, evidence of the company's value or its potential profitability quantified the value of those relationships. In that vein, Agracat argues that the following evidence gave the jury a basis from which to compensate Agracat for the loss of its business relationships: 1) Downing's agreement to exchange $26,569 in accounting fees for

---

1. Agracat also pled several other counts, which were dismissed by a summary-judgment order that is not challenged on appeal.

shares in Agracat; 2) Steele's offer to sell fifty-one percent of Agracat for $1,350,000, or forty percent for $1,200,000; 3) Hunt's offer to buy Steele's share of the company for $1,000,000, plus nine percent of a new venture; 4) Downing's and his associate's profit and earnings projections; 5) Hunt's response to Steele's inquiry in March 2004 that AFS would take $6,900,000 for its interest in the tractor business.

■■ Agracat acknowledges, and we agree, that even with the above mentioned evidence, the value of its lost business relationships is difficult to express in dollars and cents. We appreciate the difficulty encountered by a plaintiff in proving these types of damages. However, we feel compelled to point out that testimony from an expert witness or from Steele or other Agracat officers would have gone a long way toward reducing that difficulty and could possibly have avoided a directed verdict. That being said, we do not believe that a directed verdict was proper in this case. Damages should not be deemed unrecoverable simply because they are problematic to ascertain. *See Mine Creek Contractors, Inc. v. Grandstaff,* 300 Ark. 516, 780 S.W.2d 543 (1989); *Royal Manor Apts. v. Powell,* 258 Ark. 166, 523 S.W.2d 909 (1975); *Employers Ins. of Wausau v. Didion Mid–South Corp.,* 65 Ark. App. 201, 987 S.W.2d 745 (1999). Arkansas law has never insisted on exactness of proof in determining damages, and if it is reasonably certain that some loss occurred, it is enough that damages can be stated only approximately. *Morton v. Park View Apts.,* 315 Ark. 400, 868 S.W.2d 448 (1993); *Jim Halsey Co. v. Bonar,* 284 Ark. 461, 683 S.W.2d 898 (1985).

■■ ｜₈The United States Supreme Court case of *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), is illuminating on this point.[2] The Court stated that

> there is a clear distinction between the measure of proof necessary to establish the fact that the petitioner has sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages that are definitely attributable to the wrong and only uncertain in respect of their amount.
>
> . . . .
>
> Where the tort itself is of such a nature to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amends for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

282 U.S. at 562–63, 51 S.Ct. 248. The Court also quoted from a decision by the Michigan Supreme Court, *Allison v. Chandler,* 11 Mich. 542, 555–56 (1863):

> Juries are allowed to act upon probable and inferential as well as direct and positive proof. And when, from the nature of the case, the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make

---

**2.** Our supreme court cited *Story* with approval in *Royal Manor Apartments, supra.*

the most intelligible and probable estimate which the nature of the case will permit.

282 U.S. at 564, 51 S.Ct. 248. An example of the *Story Parchment* philosophy may be found in the Arkansas case of *One National Bank v. Pope,* 372 Ark. 208, 272 S.W.3d 98 (2008). In *Pope,* the jury was asked to award damages for the loss of a decedent's life. The decedent's estate presented evidence that the decedent was a mother and a grandmother, that she was close to her oldest daughter, that she worked as a waitress, that she lived with a man, and that, at the time of the accident that took her life, she was en route to a family gathering. The trial court granted a directed verdict against the estate on the damages issue, but the supreme court reversed, holding that the estate produced substantial evidence from which the jury could have inferred or derived the value that the decedent placed on her life.

Based on the language in *Story Parchment,* the holding in *Pope,* and the other cited authorities, we conclude that Agracat produced substantial evidence from which the jury could have calculated a damage award. Though Agracat's proof may have been mathematically complex and subject to a wide range of values, it did not require the jurors to craft an award out of thin air. Rather, the proof presented data from which the jurors, in the exercise of common sense and prudent judgment, and with guidance from Agracat during closing argument, could have assigned a value to Agracat's losses. Unquestionably the jurors in this case had a much greater pool of evidence to draw from than the jurors in *Pope*. We therefore reverse the directed verdict.

Agracat also argues that the circuit court erred in excluding a proffered exhibit. We address this issue for guidance to the circuit court and the parties, given that it is likely to arise on retrial. The exhibit in question was a market analysis prepared in late 2004 or early 2005 by Rodney Miller, the CEO of Montana Tractors. It analyzes Montana's competition, discusses the company's 2005 budget and new product lines, and attempts to predict the company's value and net income for the year 2005. Agracat offered the exhibit during the testimony of Dan Downing, but the court declined to admit it on several grounds: 1) the person who prepared the exhibit, Rodney Miller, was not available to testify; 2) the exhibit did not qualify as lay opinion testimony by Downing; 3) the exhibit was unreliable because it was based on sheer speculation.

We cannot say that the circuit court abused its discretion in excluding the exhibit. *See FMC Corp. v. Helton,* 360 Ark. 465, 202 S.W.3d 490 (2005) (applying the abuse-of-discretion standard to evidentiary rulings). Downing took no part in the exhibit's preparation and demonstrated little if any familiarity with it when it was presented to him at trial. The exhibit was therefore not "rationally based" on Downing's perception, as required for the admission of lay opinion testimony. Ark. R. Evid. 701(1). Additionally, the exhibit contained predictions of the future value of Montana Tractors, which the court understandably found speculative and unreliable as a means of assessing Agracat's damages. Furthermore, those predictions were based on estimates and projections by a person who was not subject to cross-examination and was not available at trial to offer a sufficient explanation of his methodology. Under these circumstances, the circuit court's refusal to admit the exhibit was well founded.

Agracat contends that the exhibit constituted an admission by appellees and, as such, was not excludable as hearsay. Ark. R. Evid. 801(d)(2). We note that hearsay

was only one of the court's reasons for excluding the exhibit. In any event, we have serious doubts that the ⌐₁₁exhibit's speculative contents qualified as an admission. Rule 801 defines an admission as a "statement offered against a party" and in turn defines a statement as "an oral or written *assertion.*" (Emphasis added.) Assertion traditionally means saying that something is so or that an event transpired or a condition existed. *See* 2 Kenneth Broun, *McCormick on Evidence* § 246 (6th ed.2006).

Reversed and remanded.

HART and KINARD, JJ., agree.