2010 Ark. App. 659

Luke BRADSHAW, Bill Davis, Andrew Powviriya, Ed Wonnacott, A.W. Bravis Agency, LLC, and Novus Products Company, LLC, Appellants

v.

ALPHA PACKAGING, INC., d/b/a Edge Marketing Group, Appellee.

No. CA 09–1141.

Court of Appeals of Arkansas.

Oct. 6, 2010.

George Alan Wooten, Robert Ashley Frazier and Pamela D. Roberts, Warner, Smith & Harris, PLC, Rogers, for appellant.

John Paul Verkamp, Charleston, for appellee.

ROBERT J. GLADWIN, Judge.

Appellee Alpha Packaging Inc., sued the six appellants in this case for misappropriation of trade secrets, conversion, breach of contract, violation of the Arkansas Deceptive Trade Practices Act (ADTPA), fraud, and unjust enrichment. Following a lengthy trial, the jury returned a general verdict in favor of Alpha for $185,000 in compensatory damages and $7,500 in punitive damages. Appellants asked the circuit court for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, but the court denied their request. Appellants now seek reversal on the grounds that the jury's verdict was not supported by substantial evidence and that the circuit court erred in admitting one of Alpha's exhibits. We affirm.

In reviewing the circuit court's denial of a JNOV or a new trial, we must determine whether the jury's verdict was supported by substantial evidence. *Gibson Appliance Co. v. Nationwide Ins. Co.*, 341 Ark. 536, 20 S.W.3d 285 (2000); *Gassman v. McAnulty*, 2009 Ark. App. 471, 325 S.W.3d 897. Substantial evidence is that which goes beyond suspicion or conjecture and compels a conclusion one way or another. *Gassman, supra.* We view the evidence and all reasonable inferences therefrom in the light most favorable to the party on whose behalf judgment was rendered. *Id.* With these standards in mind, we set forth the following pertinent facts as developed at trial.

Alpha Packaging, Inc., is a Northwest Arkansas company that manufactures and sells packing and shipping products, such as corrugated boxes, bubble wrap, and tape. In January 2006, Alpha formed a division called Edge Marketing, which was devoted to point-of-purchase (POP) design and sales. Appellant Luke Bradshaw became the division president, and three other employees also joined the ranks: appellants Bill Davis, Andrew Powviriya, and Ed Wonnacott. These appellants were at-will employees and constituted the entire Edge creative and sales workforce. At least two of the employees—Bradshaw and Davis—had prior POP experience and had developed relationships with companies that would later become Edge clients.

After Alpha hired the four employees to work for Edge, it presented them with a "Confidentiality and Proprietary Information Agreement." The agreement recited that, during the course of the employees' work, Alpha might disclose certain "trade secrets" to them, including customer lists

and pricing data. The employees, by signing the documents, agreed that, both during their employment and in the future, they would not use for themselves or others, or disclose to others, the company's trade secrets, confidential information, or other proprietary data. They also agreed that, upon termination of their employment, they would return all company documents, property, and customer lists, and that they would not retain copies, notes, or abstracts of documentary items.

Edge generated appreciable revenue in 2006 and was projected to do well in 2007. Bill Davis sent Alpha's president Michael Stec a document that, while unrealistic in some respects, forecast approximately three million dollars in sales for Edge in 2007. Edge in fact made a small profit in the first quarter of 2007. Unbeknownst to Stec, however, the four employees had been planning their exit from Edge since at least April and May 2007 in order to form their own POP marketing and design firm. Stec received the employees' letters of resignation on May 23, 2007, effective May 31, 2007. When Stec discovered that Bradshaw, who was responsible for considerable billing in previous months, had no invoices for ongoing jobs in May, he surmised that the employees had used Edge resources to develop a new venture, and he terminated their employment immediately. He also refused to pay them for any time after May 15.

Later events appeared to bear out Stec's suspicions. He discovered that the employees had enlisted an Edge client, Novus Products, LLC, as the financial backer for their new firm, which they called the A.W. Bravis Agency. Documents showed that, while on Edge company time, the employees obtained new computers and cell phones for their new business, courtesy of Novus, and that some of the employees received checks from Novus for two weeks'

work on June 1, 2007. Additionally, one of the employees forwarded all Edge cell phones to the new Bravis phones prior to their resignations. Stec learned as well that the employees, upon leaving Edge, deleted all information from their computers, which included customer artwork, invoices, and price quotes. He further determined that one of Edge's cameras could not be accounted for and that the employees had left the Edge offices in disarray, strewn with several rolls of expensive posters and banners for which no customer was invoiced. At trial, the employees denied taking the camera and leaving the office cluttered, and they said that they left back-up disks for the computerized information. Stec and his wife testified, however, that the disks contained information no more recent than 2002 or 2006.

At some point, Alpha retrieved from the employees' hard drives a business plan that Luke Bradshaw had prepared for the employees' new venture in early May 2007. The plan included an eighteen-month history of Edge sales that included client names, projects, project dates, sales invoice amounts, and net profits on each project, plus a 2007 "Remainder Forecast" for Bravis, listing projects for many of those same Edge clients. There was evidence at trial that the employees presented this information to Novus in an attempt to obtain financing for their venture.

The employees in fact obtained financing from Novus, and by June 2007, were invoicing clients, which they continued to do successfully throughout the year. The company's projects included some that had begun at Edge in April or May 2007 and included clients that were identified as Edge customers on the business-plan list. Stec attempted to bring in new personnel to continue the business at Edge but was advised that it was not feasible to do, at

least in part because of the loss of computer data.

On August 1, 2007, and by subsequent amended complaints, Alpha sued Bravis, Novus, and the four employees for misappropriation of trade secrets, conversion, breach of the confidentiality agreement, violation of the ADTPA, fraud, and unjust enrichment. The case went to trial, and, following deliberations, the jury returned a general verdict in favor of Alpha for $185,000 in compensatory damages and $7,500 in punitive damages.[1] The circuit court entered judgment accordingly and later denied appellants' motion for a JNOV or, in the alternative, a new trial. This appeal followed.

 Appellants' primary argument on appeal is that Alpha's causes of action were not supported by substantial evidence. Because the jury's finding was rendered on a general verdict form, we have no way of knowing the particular theory on which the jury found appellants liable. Thus, if substantial evidence supports the verdict on any one theory, we will affirm. *See generally Costner v. Adams*, 82 Ark.App. 148, 121 S.W.3d 164 (2003). In this case, |₆we conclude that, although much of the proof in the case was heavily contested, Alpha produced substantial evidence to support a verdict for misappropriation of trade secrets.

 Arkansas law permits a plaintiff to recover damages for misappropriation of a trade secret. Ark.Code Ann. §§ 4–75–601 through 607 (Repl.2001). The Act defines a "trade secret" as information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark.Code Ann. § 4–75–601(4) (Repl.2001). Additionally, our courts rely on six factors to determine whether information qualifies as a trade secret: 1) the extent to which the information is known outside the business; 2) the extent to which the information is known by employees and others involved in the business; 3) the extent of measures taken by the plaintiff to guard the secrecy of the information; 4) the value of the information to the plaintiff and its competitors; 5) the amount of effort or money expended by the plaintiff in developing the information; 6) the ease or difficulty with which the information could properly be acquired by others. *Freeman v. Brown Hiller, Inc.*, 102 Ark.App. 76, 281 S.W.3d 749 (2008).

Appellants argue that the information that Alpha seeks to protect in this case does not qualify as a trade secret. We disagree. Customer lists and account information are secrets worthy of protection under the proper circumstances. *Cardinal Freight Carriers, Inc. v. J.B. |₇Hunt Transp. Servs.*, 336 Ark. 143, 987 S.W.2d 642 (1999); *Allen v. Johar, Inc.*, 308 Ark. 45, 823 S.W.2d 824 (1992); *Freeman, supra.* In the instant case, the jury could reasonably have concluded that Edge's customer, pricing, ongoing project, and profit information, which appeared in the Bravis business plan, met the necessary

---

1. The employees counterclaimed for unpaid wages, which the jury did not award. Also, during the trial, Bravis and Novus obtained directed verdicts on Alpha's claim for breach of the confidentiality agreement, and Novus obtained a directed verdict on the fraud count. Appellants' motion for a directed verdict was otherwise denied.

criteria. The information possessed independent economic value from not being known to or readily ascertainable by a competitor, as shown by the testimony of both Michael Stec and Don Moore of Novus, who financed the employees' new business. Stec testified that a competitor could "kill our entire company" with that type of information. Don Moore of Novus recognized that "you don't broadcast your sales history such as your invoice totals and your profits for various projects." Furthermore, the economic advantage to Bravis in acquiring Edge's pricing and profit data is apparent. The new company was able to get up to speed in a matter of weeks on the shoulders of that knowledge, virtually closing down a competitor in the process.

▮ Alpha also made reasonable efforts to maintain the secrecy of its customer and account information. Stec testified that his company used confidentiality agreements, computer passwords, document shredding, and other methods that restricted the flow of customer and pricing information both within and outside the company. *See Tyson Foods, Inc. v. ConAgra, Inc.*, 349 Ark. 469, 79 S.W.3d 326 (2002). Additionally, the confidentiality agreements signed by the employees expressly identified customer lists, pricing data, and financial data as trade secrets. Our supreme court has considered this a significant factor in determining whether information constitutes a trade secret. *See Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999); *Cardinal Freight Carriers, Inc., supra.*[2]

Appellants contend that Alpha's customer list should not be deemed a trade secret because Alpha developed the list within a short period of time rather than over a number of years and the list did not contain minute details about customer preferences like the customer list that was ruled a trade secret in *Johar, supra.* While these factors may be considered on the question of whether a customer list is a trade secret, they are not dispositive in this case. The information appropriated by appellants was not long in the development, but it was rich in substance, containing not only customer identities but customer data about ongoing projects, prices, and profits. In this respect, we believe the information appropriated by appellants contained as much significant detail as the customer list in *Johar.*

Appellants also note that Luke Bradshaw and Bill Davis had long-standing relationships with some Edge customers that pre-dated either the customers' or the employees' relationships with Edge. Again, this is a factor that may be considered in deciding whether a customer list constitutes a trade secret, *see Hi–Line Elec. Co. v. Moore*, 775 F.2d 996 (8th Cir. 1985), but it does not carry the day in the present case. The employees here not only continued their relationships with Edge's customers but made use of and disclosed to others the customers' project and pricing information, along with Alpha's profit information. Appellants claim further that Alpha could not have considered its customer and pricing information a trade secret because it sent the four employees monthly statements (during their tenure with Edge) containing customer names and invoice amounts. There is no indication, however, that these docu-

---

**2.** Appellants argue that the confidentiality agreements were not supported by consideration because the employees signed them after they were hired by Alpha. Yet, the agreements themselves state that they are made "in consideration of being employed by Alpha." Additionally, continued employment may serve as consideration for a new or modified contract. *See Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991).

ments contained more information than was necessary for the employees to verify their commissions.

■ The question of what constitutes a trade secret is fact-intensive. *See Vigoro Indus., Inc. v. Crisp,* 82 F.3d 785 (8th Cir.1996). In light of the particular facts in this case, the jury had before it substantial evidence on which to find appellants liable for theft of trade secrets. We therefore affirm on this point.

■ Appellants' remaining arguments are directed to Alpha's trial exhibit that contained information about Alpha's damages. The exhibit listed various dollar amounts as damages for: 1) "unjust enrichment invoices," which were invoices sent by Bravis to clients that Bravis allegedly took from Edge; 2) invoices that Edge customers did not pay because their paperwork had been deleted from Edge's computers; 3) Edge's development costs for one client; 4) the cost of the posters and banners left on the floor, and the missing camera; 5) wages paid to the four employees in May when Alpha contends they were already working for their new company; 6) expenses charged on Edge credit cards when the employees were allegedly already working for their new venture; 7) Bravis's forecasted profits in 2007. In closing arguments, Alpha's counsel explained to the jurors that they were not expected to add up all of the figures on the exhibit (which would have totaled over $600,000) but that the exhibit simply contained items they needed to know to reach a verdict. Appellants argue that the circuit court abused its discretion in admitting the exhibit because it was confusing and contained damage figures that were speculative.

We note at the outset that, because the jurors rendered a general verdict, we cannot say how they arrived at their damage award or what portions of the exhibit they may have accepted, rejected, or used in combination. Consequently, we will not question or theorize about the jury's findings. *See, e.g., Tyson Foods, Inc. v. Davis,* 347 Ark. 566, 66 S.W.3d 568 (2002). In any event, the dollar amounts listed on the exhibit were taken from trial testimony and sought to give the jury some basis for an award of damages in this complex case. We held in *Agracat, Inc. v. AFS–NWA,* 2010 Ark. App. 458, 379 S.W.3d 64, that Arkansas has never insisted on exactness in determining damages, and if it is reasonably certain that some loss occurred, it is enough that damages can be stated only approximately. We further recognized in *Agracat* that juries may act on probable and inferential proof of damages and that a plaintiff may place before a jury all the facts and circumstances tending to show damages or their probable amount, after which the jury may make its most intelligible and probable estimate. Given the substantial evidence that Alpha sustained some loss in this case, we conclude that the information on Alpha's exhibit was properly presented to the jury and that the circuit court did not abuse its discretion in admitting it.

Affirmed.

GLOVER and ABRAMSON, JJ., agree.