SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-15-469

| | |
|---|---|
| GIBRALTAR LUBRICATING SERVICES, INC. <br> APPELLANT <br><br> V. <br><br> PINNACLE RESOURCES, INC. <br> APPELLEE | **Opinion Delivered** March 9, 2016 <br><br> APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. CV-12-233] <br><br> HONORABLE TOM HUGHES, JUDGE <br><br> REVERSED AND REMANDED |

## M. MICHAEL KINARD, Judge

In this trade-secrets case, appellant Gibraltar Lubricating Services, Inc. (GLS), appeals from a summary judgment in favor of appellee Pinnacle Resources, Inc. (Pinnacle). Because genuine issues of material fact remain to be decided, we reverse and remand for further proceedings.

Our standard of review is well established. Summary judgment should be granted only when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Akers v. Butler*, 2015 Ark. App. 650, 476 S.W.3d 183. On appeal, we view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id*. With this standard in mind, we turn to the evidence presented by the parties in their affidavits and other documents filed in connection with the summary-judgment motion.

 

II. *Facts*

GLS provides lubricants to industrial customers who use large compressors. The lubricants contain a blend of oils and additives that inhibit rust and corrosion and reduce the foaming generated by compressor churning. GLS hires outside contractors to blend its lubricants based on precise formulas.

The formulas at issue in this case were developed more than thirty-five years ago by a man named Glen Majors, owner of C.E.S. Associates, Inc. In 1991, Mr. Majors formed GLS with James and Linda Bass and purchased C.E.S.'s assets, including its formulas and blending instructions, for $38,500. In 1993, Mr. and Mrs. Bass bought out Majors and became the sole owners of GLS. They operated from an office in Beebe, Arkansas, with one employee, Veronica Craven. The company produced the same lubricants using the same trusted blenders as in the past. Mr. Bass kept the formulas locked in a cabinet or safe, to which Mrs. Bass and Ms. Craven had access.

In 2008, Pinnacle, a custom blending company, contacted Mr. Bass with hopes of becoming a blender for GLS. During a meeting at the Beebe office, Bass explained to Pinnacle's salesman, John Bethel, that he was nervous about disclosing the lubricant formulas. Bethel assured Bass that Pinnacle would maintain the formulas' secrecy.

Thereafter, Mr. Bass provided Pinnacle with documents containing a particular lubricant formula. One of the documents bore a stamp prohibiting copying or duplicating of its contents. Bass also sent Bethel an email, asking him to "please keep a tight grip on the

formulas," to which Bethel replied, "Absolutely." Several months later, Bass wrote the following to Bethel:

> I know we have talked about it before, do you have our formulas in a safe place, it would be terrible if [certain other companies] got hold of them some way. That has always concerned me and is the reason we have been so careful on who got our formula.

Bethel responded that the formulas were "in a very safe place" and were "kept in locked secured areas at night."

Pinnacle eventually began blending GLS lubricants, and was asked to blend a synthetic lubricant that had been blended for GLS by another company. At some point, GLS's largest customer, Kinder Morgan, became interested in the synthetic product. Pinnacle offered to be the blender, but Pinnacle insisted that, for quality-control purposes, it would have to be the sole supplier to the Kinder Morgan facility. GLS rejected this exclusive arrangement, and the two companies stopped doing business together.

Thereafter, Pinnacle developed and marketed a new synthetic lubricant, which Kinder Morgan allegedly put into use. GLS subsequently lost Kinder Morgan as a customer.

In 2012, GLS sued Pinnacle in White County Circuit Court for misappropriation of trade secrets.[1] The complaint alleged that Pinnacle had improperly used GLS's formulas in developing the new lubricant and that Pinnacle was selling the new lubricant to GLS's established customers. Pinnacle denied using the GLS formulas and denied that the formulas constituted trade secrets.

---

[1]GLS also sued Pinnacle for breach of contract and conversion. Those counts were dismissed by the circuit court and are not relevant to this appeal.

III. *Summary Judgment*

Pinnacle moved for summary judgment on the ground that GLS's formulas did not meet the definition of a trade secret contained in Arkansas Code Annotated section 4-75-601(4) (Repl. 2011). That statute defines a trade secret as information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

> (A) Derives independent economic value, actual or potential, *from not being generally known to, and not being readily ascertainable* by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(Emphasis added.) Pinnacle contended that, because the GLS formulas were "generally known" and "readily ascertainable," they were not trade secrets. In support of its argument, it submitted the affidavit of Dr. David Wooten, an analytical chemist with expertise in tribology, the science of friction, lubrication, and wear.

Dr. Wooten described the GLS formulas as "simple, unsophisticated lubricants," whose ingredients were "readily detectable by widely available laboratory testing protocols." He said that the formulas' ingredients could be identified by performing two hours of testing on each lubricant, plus another six hours to ascertain the ingredients' relative weights, all at a cost of $3,000 to $4,500 per lubricant. Wooten stated that the testing would involve "reverse engineering" of the GLS formulas—a process of starting with a known product and working backward to find the method by which it was developed.

Dr. Wooten also offered his opinion that GLS's formulas were generally known in the lubrication industry. Attached to his affidavit were over 100 pages of articles, book excerpts,

and advertisements that discussed numerous ingredients capable of achieving rust protection, corrosion protection, defoaming, and other attributes touted by GLS in its lubricants. According to Dr. Wooten, the ingredients mentioned in those publications were the same as those used by GLS. Dr. Wooten additionally described certain lubricating-oil patents, which he said contained the same ingredients, within the same weight ranges, as the GLS lubricants.

In response, GLS submitted the affidavit of a chemist, John Cicoria. Mr. Cicoria characterized GLS's formulas as "unique" and "not easily ascertainable." He detailed a five-step process for reverse engineering a GLS lubricant, which would require "many hours, if not days or weeks to replicate the sample formula provided to the chemist" and would cost much more than Dr. Wooten had estimated.

GLS additionally provided affidavits from James Bass, Linda Bass, and Veronica Craven. Mr. Bass stated that, "since 1991, the identity of the [GLS] additive package and the proper mixture was kept highly confidential." He said that the formula for the additive package was never discussed with customers or seminar/trade-show attendees and had only been disclosed to a few, trusted blenders. He also said that the formulas were not readily ascertainable and, to his knowledge, had never been reverse engineered by others. Mrs. Bass and Ms. Craven echoed that the formulas were not generally discussed and were kept secret.

Following a hearing, the circuit court granted summary judgment in favor of Pinnacle. In doing so, the court cited Dr. Wooten's "great credibility based on the specificity of his conclusions, his background, and his area of expertise." The court particularly noted that Dr. Wooten's affidavit, unlike Mr. Cicoria's, contained the actual cost that would be

5

incurred—$3,500 to $4,000—in reverse engineering each GLS lubricant. Relying on those figures, the court found that the cost of reverse engineering was "so small" that the GLS formulas were readily ascertainable and, therefore, not trade secrets. GLS appeals the summary-judgment order.

## IV. *Arguments on Appeal*

GLS argues that the summary-judgment order should be reversed because the circuit court engaged in improper credibility determinations. We agree for the following reasons.

The question of whether information meets the definition of a trade secret is fact intensive. *Bradshaw v. Alpha Packaging, Inc.*, 2010 Ark. App. 659, 379 S.W.3d 536. Here, the central issue before the court was whether the GLS formulas were readily ascertainable, such that they did not qualify as trade secrets. Relative to this issue, the circuit court received affidavits from two expert witnesses, each of whom offered an opinion on the matter, with the focus being the expense and difficulty involved in reverse engineering the GLS lubricants. Dr. Wooten regarded the GLS formulas as simple compositions that could be reverse engineered in a matter of hours for a specific price. Mr. Cicoria referred to the formulas as unique, and he explained the time-consuming process that would be involved in reverse engineering them. The court resolved this issue by favoring the conclusions drawn by Pinnacle's expert, Dr. Wooten, based on Dr. Wooten's "great credibility." Summary judgment should not be granted if it is necessary to weigh the credibility of statements to resolve an issue. *See Turner v. Northwest Arkansas Neurosurgery Clinic*, 84 Ark. App. 93, 133 S.W.3d 417 (2003); *Adams v. Wolf*, 73 Ark. App. 347, 43 S.W.3d 757 (2001). We cannot

help but conclude that the circuit court placed significant weight on Dr. Wooten's credibility in this instance. Summary judgment was therefore improperly granted.

We likewise agree with GLS that the circuit court made improper factual findings in granting summary judgment to Pinnacle. Factual findings are not appropriate at the summary-judgment stage. *See Po-Boy Land Co., Inc. v. Mullins*, 2011 Ark. App. 381, 384 S.W.3d 555. In this case, the court not only found that Dr. Wooten was the more credible expert but also found that his estimated cost to reverse engineer each GLS lubricant was so small that the lubricant formulas could be deemed readily ascertainable. Reasonable minds could differ as to whether a price of $3,500 to $4,000 per lubricant was small enough to render the formulas readily ascertainable. Thus, summary judgment was improper for this reason as well.

Pinnacle argues that Mr. Cicoria's opposing affidavit was not specific enough to call Dr. Wooten's conclusions into question. On the contrary, Cicoria detailed the process, the number of steps, and the length of time it would take to reverse engineer a GLS lubricant. After stating these matters, he opined that the cost of reverse engineering would be much higher than Dr. Wooten had predicted. This is not a case of Mr. Cicoria's affidavit being entirely conclusory. *See Swindle v. Lumbermens Mutual Casualty Co.*, 315 Ark. 415, 869 S.W.2d 681 (1993) (recognizing that a party cannot create a fact question by submitting a conclusory affidavit).

Pinnacle also claims that the mere fact that the GLS formulas were capable of being reverse engineered made them generally known to, and readily ascertainable by, third persons.

However, a formula or product may maintain its status as a trade secret, even though it can be reverse engineered, if the process of reverse engineering is too difficult or costly. *See* Restatement (Third) Unfair Competition § 39 cmt. f (1995); *Avidair Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966 (8th Cir. 2011). As stated above, a fact question remains as to the cost or difficulty of reverse engineering the GLS formulas.

Pinnacle additionally points to the publications and patents attached to Dr. Wooten's affidavit as evidence that the ingredients in GLS's formulas were generally known. However, none of those items purport to contain the actual GLS formulas. Even where information about a product or its ingredients is publicly available, such as through a patent, it may be the combination of characteristics and components that offers a competitive advantage. *See* Restatement (Third) Unfair Competition § 39 cmt. f; *Minnesota Mining & Manufacturing Co. v. Pribyl*, 259 F.3d 587 (7th Cir. 2001). Here, Mr. Bass stated that the GLS lubricants have had years of proven success in the industry and that he considers the composition and formulation of GLS's additive package to be a trade secret.

Finally, Pinnacle asks that we affirm the grant of summary judgment on alternative grounds not expressed in the circuit court's order, i.e., that GLS did not engage in reasonable efforts to protect the secrecy of its formulas, and that GLS did not offer proof of the money or effort it had expended to develop its formulas. *See* Ark. Code Ann. § 4-75-601(4)(B); *Saforo & Associates, Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999). Without belaboring the point, we decline to uphold the summary judgment on these grounds, given

the factual questions involved. As with the other issues discussed herein, they are better suited to resolution in trial.

Reversed and remanded.

WHITEAKER AND HIXSON, JJ., agree.

*Millar Jiles, LLP*, by: *Daniel C. Brock*, and *Edwards & Freeman, P.A.*, by: *Rodney A. Edwards*, *pro hac vice*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *John Keeling Baker* and *Clayborne S. Stone*, for appellee.