

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–13–75

|  |  |
|---|---|
| | **Opinion Delivered** January 29, 2014 |
| TIMOTHY ROGER SIMPSON, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF EDITH LAVERNE SIMPSON, DECEASED <br> APPELLANT | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT [NO. PR–10–131] |
| V. | HONORABLE PAMELA HONEYCUTT, JUDGE |
| BOBBY SIMPSON ET AL. <br> APPELLEES | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Timothy Roger Simpson, as the personal representative of the Estate of Edith Laverne Simpson, deceased, appeals the September 5, 2012 order of the Craighead Circuit Court setting aside Edith's May 8, 2006 will.[1] Appellant argues that the court erred by setting the will aside based on a finding of undue influence by appellant. We find no error and affirm.[2]

The facts necessary to understand the instant case are as follows. Julius and Edith Simpson were married for more than five decades and raised nine children during that time.

---

[1] The order lists the date of the will as May 8, 2010, but it is clear that the will set aside was created in 2006.

[2] This is the second time this case has been before us. We originally ordered rebriefing due to deficiencies in appellant's abstract and brief. *See Simpson v. Simpson*, 2013 Ark. App. 581.

On September 19, 2002, Mr. and Mrs. Simpson executed mirror-image wills. The assets of the estate were divided equally among seven children[3] and one child was specifically excluded,[4] in the event that both spouses were deceased. Tammy Earnhart was appointed the personal representative of both wills. Julius died on July 28, 2005. Shortly after Julius's death, on August 3, 2005, Edith executed a durable power of attorney granting Timothy and Tammy joint power. On April 21, 2006, Edith called her attorney, Charles M. "Skip" Mooney, Sr., and advised that she was destroying the original will. On May 8, 2006, Edith executed a will revoking the 2002 will. In the May 8, 2006 will, Edith specifically excluded appellees. She left her entire estate, including over seven hundred acres of farmland, to appellant. She also granted appellant the sole power of attorney. Edith died on April 15, 2010, at the age of eighty-four.

On April 23, 2010, appellant filed a petition to probate the May 8, 2006 will, and to be appointed personal representative according to the terms of the will. He accepted the appointment on the same day. An order admitting the will to probate was entered on April 26, 2010, and a letter of administration was filed on that date. Appellees filed a notice objecting to the probate of the will on June 28, 2010. They contended that the 2006 will was the result of fraud and/or undue influence based on threats made by appellant and the fact that

---

[3]Bobby Charles Simpson, Phyllis Ann Cox, Stephen Earl Simpson, Benjamin (Bennie) Keith Simpson, Dennis Mark Simpson, Tammy Simpson Goff (now Earnhart), and Timothy Roger Simpson. With the exception of Timothy, these children are the appellees in this action.

[4]Julius Ralph Simpson, Jr. There is no evidence explaining why only eight children are specifically listed in the will although the Simpsons had nine children.

appellant and Edith had a confidential relationship. They also sought to have the 2002 will probated and a personal representative appointed. Appellant denied the material allegations of appellees' objection in his response filed July 12, 2010. Amendments to the objection were filed on September 1, 2011, and October 24, 2011.

A hearing took place on November 2, 2011. Appellant testified that he was the youngest child of the family; that he never picked cotton on the family farm; that his parents supported him until their deaths; that he had Graves' disease; and that at one time he hated Tammy. He stated that Tammy visited Edith on major holidays, but that she never came back after 2005. He said that Phyllis visited Edith after 2005. Appellant denied breaking Edith's windshield because he was upset that he and Tammy were jointly granted power of attorney. He also denied making statements to Edith threatening Tammy's life. Appellant stated that Edith was angry with Tammy, Dennis, and Bennie because they tried to have him locked up. Appellant testified that he fired a shotgun inside the house, striking a television, during a suicide attempt. He also stated that he destroyed the refrigerator with his bare hands, and buried a freezer in the yard. However, he denied shooting out a window in the house. According to appellant, this all took place in January 2006, and Edith was home at the time. Appellant admitted that on February 3, 2006, he took approximately fifty pills and then attempted to drive to Walnut Ridge with Edith in the vehicle. He wrecked the car and was subsequently arrested for driving while intoxicated (DWI). Following his arrest, appellant was placed in Mid–South Health Systems' Crisis Unit for substance abuse and mental health diagnosis/treatment.

3

SLIP OPINION

Appellant testified that Tammy introduced him to marijuana when he was only nine years old. He denied making a statement to his counselor that he was introduced to drugs at age ten by one of his older brothers. He stated that when he told the counselor at Mid–South that marijuana and alcohol were his drugs of choice and that he spent his days drinking until he passed out, he was speaking about the past. Appellant said that he told his counselor that everyone was scared of him on July 6, 2006. He admitted that he told his counselor on July 27, 2006, that he had awakened with blood on his face and thought that he had killed someone. He also stated that he told his counselor on August 11, 2006, that his mother had recently taken everyone out of her will except him. He, however, denied telling his counselor that he was glad that he had "screwed" appellees out of everything. He contended that he did not do anything to cause Edith to change her will in his favor. Appellant testified that he did not learn about changes to Edith's will until the summer. He opined that appellees did not love Edith and that they hated their father. Appellant admitted that he told Edith that Tammy physically abused him when he was younger, including trying to smother him, but he insisted that he made this disclosure over twenty years ago. According to appellant, Edith did not trust Tammy after 2006.

On cross-examination, appellant stated that he did not remember his parents being angry with any of his siblings, with the exception of Bobby. He testified that none of his siblings came and helped Edith around the house after their father died. Appellant stated that he never discussed business with his mother; however, he said that she did ask his input during the last couple years of her life. He testified that despite Edith's physical problems, she had

a pretty good memory. He denied ever seeing her delusional. Appellant stated the Edith was not afraid of him and that he never hurt her. He denied ever threatening the appellees to their face. He testified that he never locked the appellees out of Edith's house.

On redirect, appellant admitted that he worried Edith, but he denied ever physically hurting her or putting her in danger. He stated that he had a problem with profanity and would use it around Edith, but that he did not direct it toward her.

Kay Simpson, Bennie's[5] wife, testified that Bennie was very close to his parents. According to Kay, they visited Edith's farm about three times a week. She also stated that Bennie performed chores for his parents, including putting in a new door and working on the hot-water heater. She said that Bennie added a garage and a bathroom to the house in 2005. She testified that they visited the Simpsons on every major holiday. However, Kay said that all changed around Christmas 2005. She said that, around Christmas 2005 she removed a blanket from a television that had been shot. According to Kay, a window in the den had also been shot before. Kay testified that Edith called her on March 6, 2006,[6] and told her that they were not to come back until appellant settled down. Kay stated that they went over to Edith's that day and that Edith was acting nervous and trying to make sure appellant was not coming around. She said that she continued to call Edith and ask if they could come visit, to which Edith would reply that she did not know. Kay stated that she went into Edith's house after appellant was arrested and that the house was "a mess." She testified that, while over

---

[5]There are places in the record where he is referred to as "Benny" and "Bennie." For purposes of this opinion, he will be referred to as "Bennie."

[6]This is the same date appellant pleaded no contest to DWI.

there, Edith told Bennie that her estate "will be divided equally between all kids." Kay stated that she did not know how the conversation came up. Kay also stated that she had heard Edith say in the past that she would not leave everything to one child. She said that when they left Edith's house, Bennie removed the firearms. She stated that Edith came to their house in August 2006 to retrieve the guns. She said that Bennie turned the guns over to Edith when she stated that she did not know what appellant would do. Kay stated that Edith returned in September 2006 to retrieve a gun that had not been returned in August. She said that they went to take some turnips to Edith, but Edith met them outside in the cold. Kay testified that when she would call Edith after March 2006, Edith would be "mumbly."

On cross-examination, Kay stated that she had not personally heard appellant threaten her or Bennie. She also said that appellant never personally told her or Bennie that they could not come to Edith's house. She testified that she did not really have any direct contact with Edith except for the two times Edith came to retrieve the guns after March 2006. She said that all of the appellees gathered at her home after the will was read to discuss it.

Bennie testified that he grew up working on his parents' farm. He stated that after he moved, he visited them about three times a week. He said that he worked on his parents' doors, water heater, and wiring. Bennie stated that he had a good relationship with his parents and that Tammy did, too. He said that he really did not have a relationship with appellant because every time they would go over there, appellant would either go outside or to his room. Bennie said that Edith told him that appellant had destroyed the icebox, deep freezer, and microwave. He stated that Edith admitted that appellant had shot out a window

in the house. According to Bennie, Edith also told him that appellant knocked out her car window with his fist after she initially told everyone that a rock had damaged the vehicle. Bennie stated that Edith never told him that appellant had threatened anyone. He said that he went to Edith's house a couple of times after the March 2006 telephone call. He stated that he initially went the day of the call and that Edith was "fidgeting and looking back toward the living room . . . afraid Tim was going to come out." He said that they stayed a few minutes and then left. He testified that he did not know why he did not do anything to ensure Edith's safety.

On cross-examination, Bennie stated that he was not afraid of appellant and that appellant never threatened him personally. He also stated that appellant never told him not to come back over to the house.

Phyllis testified that she had a fair relationship with her parents. She stated that she also worked on the farm while growing up. She said that she made most holidays before 2005. Phyllis stated that she visited Edith on and off after her father died until it got to the point that she could not tolerate appellant's language around Edith. She said that appellant would use profanity, talk about sex, and call Edith ugly. She stated that she would ask appellant not to talk that way in front of Edith and that he would put his hand on Phyllis's forehead. According to Phyllis, she quit going around until Edith got very sick.

On cross-examination, Phyllis stated that Edith would tell her not to worry about what appellant was saying because he would calm down. She said appellant continued to live at home with Edith until Edith's death. She testified that appellant and Edith spent two

Christmas Eves at her house. She agreed that prior to getting together to discuss the will, she and her siblings had not all been together since Christmas 2005. Phyllis stated that she was not afraid of appellant. She also stated that appellant never personally threatened her or told her directly or indirectly not to come to Edith's house.

Upon questioning by the court, Phyllis stated that at some point she became concerned about Edith's safety. She said that right after her father died, when she visited, Edith showed her bruises, cried, and said that she wished she was dead. She stated that appellant was outside or in his room when Edith showed the bruises. She admitted that she did not do anything to ensure Edith's safety.

Wendy McFall testified that she worked at Mid–South for five years beginning in May 2006. She stated that appellant was assigned to her for therapy purposes. However, she also stated that she did not remember any of her conversations with appellant. During her testimony, counseling records were admitted into evidence. Notes from February 14, 2006, stated that appellant threatened Edith before he could be discharged from the hospital and that he also threatened to destroy the new television Edith purchased for him. On February 15, 2006, appellant said that he did not recall threatening his family. He stated that he did not remember threatening Edith in the notes of February 16, 2006. Appellant also stated that he was angry with Tammy because she introduced him to drugs at a young age. On February 17, 2006, appellant admitted that he broke a television and a window and that he punched out a windshield. On July 6, 2006, appellant stated that everyone was afraid of him and that he could not "find a fight" anymore. He also stated that he should have been in the military

so that he could "kill and fight people." On August 3, 2006, appellant admitted sneaking drinks and drugs within the past two weeks. According to the record, he seemed remorseful because the drugs and alcohol made him "verbally and physically aggressive" and mades him do and say things he would not ordinarily do. Between August 10–11, 2006, appellant stated that Edith had recently taken everyone out of her will except him. The record states that appellant became "verbally aggressive in the way he told about his family and how he was glad he 'screwed' them out of everything." On August 16, 2006, after stating that he lies to "you people" all the time, appellant quit treatment.

Victoria Harris testified that she was Kay and Bennie's daughter. She stated that she had a close relationship with Edith and that they visited her frequently. She said that she never went back to Edith's house after she learned that they were not welcome there.

Dennis testified that he visited his parents yearly during the holidays. He said that the last time he was in Edith's house was Christmas 2005. He testified that he never saw Edith's house torn up during the times he visited. Dennis stated that he had a good relationship with his parents before his father died. He also said that he was on good terms with Edith through February 2006.

Larry Earnhart, Tammy's husband, testified that he married Tammy in 2002. According to Larry, at that time Tammy and Edith had what seemed to be a very close relationship. He said that Tammy and Edith talked on the phone almost daily. Larry stated that he and Tammy went to Edith's house on February 3, 2006, after appellant was arrested. He said that Edith was nervous and wanted to leave the house, so they took her home with

them for a couple of nights. Larry testified that while he was at Edith's, he noticed that the television had been shot, that appellees' pictures were missing from the wall, and that there was blood on the carpet. He stated that Edith told him that the blood was from appellant tearing up the refrigerator with his hands. He said that prior to February 2006, he had seen two bullet holes in the den window. Larry stated that he and Tammy visited Edith on Sundays and that Bennie, Kay, and Dennis and his family would also be there. He said that they had a "normal family situation" until the father died. He stated that Tammy was usually the one who took her parents to doctor appointments. He testified that they did not go back to Edith's house after March 2006.

On cross-examination, Larry stated that he thought appellant was potentially dangerous. However, he said that appellant had never personally threatened him, assaulted him, cursed him, or told him that he was not welcome at Edith's house. Larry testified that Edith "obviously knew that [appellant] had some mental issues."

Tammy testified that she moved back to Arkansas in 1999, after leaving home in 1987. She said that she lived in California and in Kansas City before returning to Arkansas. She stated that she and Edith wrote to each other because making long-distance phone calls were expensive. She testified that even when she lived out of state, she came home three or four times a year for different holidays. She said that in 1997 or 1998, appellant and her parents visited her in Kansas City. Tammy stated that despite being out of state in 1996, she planned and implemented a fiftieth wedding anniversary party for her parents. She testified that she did not work for a year when she came back but that she was still getting paid from previous

SLIP OPINION

self-employment. She said that she dedicated this year to spending time with her parents. Tammy said that her contact with appellant during that time was very limited. She stated that between 1999–2006 she was at her parents' house at least once a week. She testified that her parents asked her to do their FY1999 income tax return and that she continued to do the returns through FY2004. She opined that her parents trusted her. Tammy said that her parents told her in 2002 that they had made a will but that they did not tell her the contents of that will. She stated that she learned of the will when her father asked her to be the executor of the will. Tammy testified that before she left home in 1987, she babysat appellant because her parents still had a cattle farm. She said that she never tried to kill appellant or smother him with a pillow. She also denied introducing appellant to marijuana or ever smoking the drug with him. Tammy stated that she received a call from Edith around 2008 stating that appellant had told Edith that Tammy had made him smoke marijuana and had broken his arm. She said that Edith also said other things but she could not remember everything. She testified that she and Edith still got along well in 2006. She stated that Edith confided in her that she could no longer live at home and that she wanted appellant to get some help. She said that Edith told her about appellant's threats against her, Bennie, and Dennis in early March. Tammy testified that while appellant was in the hospital, she and Dennis went to the prosecutor to try to do something about appellant. She said that they were informed that Edith would have to sign a petition to get appellant committed. According to Tammy, Edith agreed to sign the petition but later declined. Tammy stated that appellant never confronted her about the situation but that he did confront Edith.

Tammy testified that after Christmas 2005, Edith started making excuses for them not to come over. She said that when she went to Edith's house after appellant was arrested, she noticed glass against the edge of the carpet from where appellant had busted all of the appellees' senior class pictures with his fist. She also noticed that there was blood on the carpet and that the television and deep freezer were missing. She stated that Edith told her appellant shot the deep freezer, dragged it out of the house, and buried it. Tammy testified that she also saw bullet holes in the window and in Edith's television. She said that while appellant was in the hospital, she overheard appellant cursing Edith or at Edith when they left the room. She stated that appellant would shut up as soon as someone walked in. Tammy said that Edith seemed happier when appellant was at Mid-South and that she was not nearly as nervous. Tammy testified that she did not know anything Bennie, Dennis, or she did to make Edith take them out of the will. She said that in less than a week following her father's death, Edith jointly granted power of attorney to appellant and Tammy. In May 2006, Edith revoked Tammy's power and granted appellant sole power of attorney. Both instruments were admitted into evidence over appellant's objections. The court stated that they were not being admitted to show undue influence, but to show that Edith changed her mind during this period of time.

Tammy stated that when she met Edith and appellant at Mooney's office in August 2005, appellant acted upset, his face was red, and he was "kind of agitated." She said that a couple of days later she saw damage to Edith's driver's side window. She stated that Edith told her that a rock had damaged the window but Tammy stated that she could tell that it had

been knocked out from the inside. Tammy said that in February 2006 Edith told her that appellant had punched the window after they left Mooney's office. She stated that, until March 2006, she never knew that appellant did not like her. She opined that appellant wanted to get the children closest to their parents "out of the picture." Tammy stated that she saw Edith four times after the March 2006 telephone call. She said that they still talked on the telephone and that Edith told her "not yet" when she asked if she could come to the house. She testified that in September 2008, Edith called her for the "original paperwork on all the land documents" because Edith said appellant wanted them back. Tammy testified that the fact that she could no longer go to Edith's house was evidence enough that appellant was controlling Edith. She said that if she called Edith when appellant was around, Edith would whisper. However, she stated that if Edith called and appellant was not around, Edith could easily be heard. She testified that her phone contacts with Edith lessened after March 2006. Tammy said that Edith was not mentally incompetent. She denied telling Edith that she wanted appellant dead. She stated that on a scale from one to ten, her relationship with Edith was a ten. Tammy testified that she learned in March 2006 that she would not be doing Edith's tax returns. She said that she invited Edith to her house each Christmas but that Edith declined to come. She also stated that Edith told her that appellant said that she stole money from her father's wallet. According to Tammy, ten years ago she overheard her parents state that their estate was going to be divided equally.

On cross-examination, Tammy stated that appellant was the only one left at home when she left. She said that she did not come around much until she moved back in 1999.

She stated that Edith had some physical problems but those problems did not prevent her "from carrying on her life." She testified that appellant returned home once he was discharged from Mid-South and the hospital. She stated that appellant was "the baby" and "had everything given to him." She admitted that appellant never physically assaulted her, threatened her, cursed her, or had an altercation with her. She testified that no one got together to celebrate Edith's eightieth birthday. She stated that 2010 was the first time all of the appellees were together since Christmas 2005. She said that Edith was intimidated by appellant but that Edith never tried to leave home or have someone remove appellant from the house. She stated that she never had a conversation with appellant about being allowed to come back to the house.

On redirect, Tammy stated that she was afraid of appellant after she saw the state of Edith's house in February 2006. She said that Edith was not afraid for her own safety, but for the safety of everyone else. She testified that Edith could not talk on the phone when appellant was around.

Richard Cox, Phyllis's husband, testified that he witnessed appellant making sexual, inappropriate statements to Edith. He said that Edith usually did not respond to appellant. He stated that every time they were around, appellant's inappropriate language would start "sooner or later." Richard said that he usually visited Edith's house once or twice a year with Phyllis. He stated that he saw bruises on Edith, but Edith would always tell them that she fell.

Mooney testified that he was familiar with the elder Simpsons and that they were a very family-oriented couple. According to Mooney, he first met them in 1975 when they

14

wished to have all of their real estate placed in both of their names. He stated that as they grew older, most of their contact with him was over the phone. He said that when they did come to his office, they were usually with Tammy. He testified that the last time he saw Edith was in 2006 when she created the will at issue. Mooney stated that Edith was concerned in her advanced age about being placed in a nursing home. She told Mooney that appellant was taking care of her and that in return, she wanted to make sure that he was properly taken care of. He said that Edith finally decided to remove everyone from her will except appellant. Mooney testified that he never had a conversation with appellant prior to the execution of the May 2006 will. He said that Edith called him about changing her will and made arrangements to come to his office on a Monday. He stated that Edith came in as scheduled but that he did not specifically remember being in the room when the will was executed. He said that he was in a "very difficult automobile accident" the following Saturday, but that he had no memory of the accident. According to Mooney, he could remember things that happened before the accident, but he said that he believed his memory was impaired to some extent about events that occurred before that time. Mooney opined that Edith had the ability to execute the will in 2006.

On cross-examination, Mooney stated that Edith began calling him in April 2006 about making changes to her will. He said that he did not know that appellant was a drug addict at the time Edith was discussing changes to the will. He stated that he also had no knowledge about appellant shooting things in the house, being in Mid–South, or making threats. He said that had these facts been known, he would have spent more time with Edith.

Mooney stated that he was unsure whether appellant was present when Edith called him about changing her will.

Robert McNeal testified that he began preparing the Simpsons' taxes in 1988. He stated that at some point, Julius got angry about something and they stopped using his services. He said that Edith returned to him in 2006 and that he continued to prepare her taxes through 2010. He stated that he discussed tax matters with Edith. McNeal testified that Edith was not irrational but that she was "very concerned, and borderline worried, about her and [appellant's] health." He stated that Edith never discussed her will with him.

Bobby Davis testified that he was a tenant on the Simpsons' farm. He stated that appellant was shy and would usually leave the room when he visited the house. He said that he did not notice any fear or apprehension when he visited the farm. He testified that Edith called him to take her to pick up appellant when appellant got discharged. He said that Edith told him appellant was mad at appellees for trying to get him committed. He stated that Edith also told him that appellant gotten into Julius's medicine and ended up shooting the television. Davis stated that Edith had health problems but that he never saw her delusional or irrational. He said that Julius explained to him the circumstances that led to one of the Simpsons' sons being cut out of the 2002 will. He stated that Edith's house was always locked and the blinds were always down. He said that Edith told him that appellant did not want any of the appellees over there. Davis stated that after Edith's death, appellant still did not want appellees to come see him because "he had a grudge against them."

On cross-examination, Davis stated that you could tell that Tammy had a good relationship with her parents. He said that after the February 3, 2006 incident, Edith was not afraid for herself but that she may have been afraid for her other children. He said that the shade-pulling and door-locking got worse after Julius died. Davis stated that Edith told him that appellant had shot the refrigerator, stove, and television. He said that appellant told him in the past year that Edith left everything to appellant.

On redirect, Davis stated that he never noticed any bruising on Edith. He also said that Edith never told him that she wanted to leave the house she shared with appellant. According to Davis, Edith told him that appellees wanted appellant admitted to a mental facility for evaluation, but Edith did not want to do that.

The deposition testimony of Dr. Brannon Treece was admitted into evidence. On direct, Dr. Treece stated that he first began treating Edith in November 2007. He stated that she was always "well kept." He said that appellant brought her to appointments and also called about her prescriptions. According to Dr. Treece, Edith was "good, mentally," and she was rational. He opined that appellant had a good relationship with Edith. He stated that he did not think that Edith was concerned for her safety, and she did not discuss any fears with him. He said that Edith never discussed her will with him. Dr. Treece stated that appellant informed him that appellant was taking care of Edith; however, he said that appellant never discussed Edith's will with him before Edith died.

On cross-examination, Dr. Treece stated that he began treating appellant in the fall of 2007. He said that he was unaware that appellant had been admitted to the hospital for an

overdose in February 2006. He testified that appellant did discuss Edith's will following her death. He stated that he recommended anger counseling for appellant in December 2010 because appellant's "tone of speech just seemed to be more pressured" when he discussed the dispute over the will. Dr. Treece said that appellant never sought anger counseling to his knowledge. He stated that Edith had a number of illnesses, including diabetes, osteoporosis, high blood pressure, renal cancer, high cholesterol, anemia, and chronic back pain. He also stated that she took a number of medications throughout the years for these conditions. According to Dr. Treece, medical records for Edith revealed that she presented to her doctor on February 7, 2006, not feeling well and under a lot of stress because one of her sons "developed some acute mental status changes and was admitted to the hospital." He testified that a February 10, 2006 MRI revealed age-related changes but that the MRI did not reveal one's mental capacity. Dr. Treece testified that Edith suffered a number of falls throughout the years as was documented by her medical records. He stated that appellant was in the treatment room with Edith ninety-percent of the time.

On redirect, Dr. Treece stated that he had not observed any behavioral problems with appellant. He said that appellant never did anything out of place in his office or in his presence. He admitted to hearing appellant curse but stated that it was not directed toward him. He opined that Edith's physical problems and medications did not affect her ability to make rational decisions.

On recross, Dr. Treece acknowledged that the changes identified in Edith's February 2006 MRI "could weaken your reserve." He testified that appellant used curse words to

describe the will-contest situation. However, he stated that appellant's language was not directed at "anyone or anything like that." He described it as frustration.

At the conclusion of the hearing, the court took the matter under advisement. It issued a letter opinion on August 8, 2012, setting the May 2006 will aside due to undue influence. An order was filed on September 5, 2012. The court found that Edith had the mental capacity to execute the May 2006 will. In its analysis of the issue of undue influence, the court stated in pertinent part:

> There is <u>no direct</u> evidence that Tim exerted "control over the mind" of Edith Simpson causing her to draft a new Will leaving everything to him however,
>
> In *Hyett* [sic] *v Wroten*,[7] the Court stated,
>
>> "Undue influence is generally difficult of direct proof.
>> It is generally exercised in secret, not openly, and like a
>> snake crawling upon a rock it leaves no track behind it,
>> but its sinister and insidious effect must be determined
>> from the facts and circumstances surrounding the
>> testator, his physical and mental condition as shown by
>> the evidence and the opportunity, of the beneficiary of
>> the influenced bequest to mold the mind of the testator
>> to suit his or her purposes." (Emphasis added.)
>
> <u>Hyett [sic] *v Wroten*</u>, is applicable to the facts in this case. Though there is no direct proof that Tim unduly influenced Edith Smith [sic] to draft the Will, there is an overwhelming amount of circumstantial evidence that Tim exerted undue influence. He frightened and bullied and manipulated her to the extent that she refused to let her children visit or to visit them, she endured tirades of anger and gun fire and then tried to make excuses for Tim, she changed accountants at Tim's request. Though she agreed for Bennie to take all guns out of the house after Tim shot the household items and window, and threatened to shoot himself at the therapist's office, she went back in August and retrieved the guns at Tim's insistence, stating, she was afraid of what he would do if she didn't get the guns. According to the Therapist's notes, Tim was still

---

[7]*Hyatt v. Wroten*, 184 Ark. 847, 43 S.W.3d 726 (1931).

SLIP OPINION

using in April and May the same month the new Will was signed. On several visits his eyes were bloodshot. On the August 3rd visit he admitted sneaking drugs/alcohol during the prior two weeks and he was laughing about screwing his brothers and sisters out of the Will.

After December, 2005, Ms. Simpson, based her actions on fear of what Tim would do or had said. Even Edith Simpson's new doctor stated that at her age, with her medical problems her "resolve" was likely weakened.

. . . .

February 7, 2006. Three months before her Will change her doctor noted, (emphasis added) patient weak, falling, not eating well, patient reports a lot of stress in her house due to her son developing acute mental status changes and being admitted to hospital. Put on Lexapro for depression. Ms. Simpson's medical problems continued to worsen throughout her life, though their relevance is that prior to May, 2006 when she executed a new Will.

Ms. Simpson had enjoyed having her family over for the Holidays throughout the years. It was Dennis, Bennie and Tammy and their children who were closet [sic] to Ms. Simpson and who did the most for her until Tim's tirades with a gun in December, 2005 and January and February, 2006 and his threats to harm the other siblings. Prior to his father's death Tim was fully supported by his parents and in his 30's living at home, yet he allowed the other children to care for his aging parents. Tammy testified that even when she did not live in Arkansas she spoke with Ms. Simpson on the telephone almost daily. Even though Tim lived here with his parents and Tammy was living out of state, it was Tammy who planned and threw a 50th wedding anniversary for her parents including invitations, refreshments etc....

She then moved back to Arkansas to take care of her parents, which she did, including taking them to doctor visits, staying with them after surgery, cooking, working in their garden, working in her mother's flower beds. In contrast, during this time period, Tim appears to have helped his parents very little. . . .

. . . .

This Court believes that Tim exercised a "positive dictation and control" over the mind of Edith Simpson. For example, Ms. Simpson told Kay and Bennie not to come over until Tim calmed down, it is evident that her actions were based on Tim's request, not her desires.

When Ms. Simpson told Tammy and her family not to come over – she stated it was because <u>Tim threatened to kill Tammy</u>. Therefore, this action was based on fear induced by Tim and Tim's request, not her will.

Tammy and others testified that after January, 2006, Ms. Simpson whispered on the telephone to them, <u>so Tim would not know she was talking to them</u>.

Ms. Simpson stated she stopped using Tammy to prepare her taxes <u>because Tim asked her to</u>. She changed accountants even though no errors were found in the years Tammy prepared them. She changed accountants because Tim told her to.

Ms. Simpson also changed doctors after her other children were excluded from her home and she and Tim started to see the same doctor around 2007.

In this instance, Tim Simpson isolated Edith Simpson the same way a domestic abuser isolates his wife from friends and family; the same way one who enslaves or brain washes another human being does; and the same way a cult separates it's [sic] members from family and friends. Edith was approximately (79) years of age when Mr. Simpson died. She was a diabetic, suffered from renal cancer, had a kidney removed, suffered from multiple fractures in the spine and severe osteoporosis. She later suffered anemic episodes requiring blood transfusions. She was taking numerous medications including pain killers. She was frightened by Tim's drug use/abuse and his tirades of shooting up the house and threatening family as evidenced when she called her nephew and was afraid to stay home for two nights after the shooting and [DWI] incidents. This was also evidenced by Edith's statements to both the mental health professionals and to her other children regarding Tim's threats. Tim made a believer out of Edith Simpson by exhibiting his anger, and violence, and by telling her lies regarding the others, particularly Tammy. Tim told Edith Simpson and a therapist that Tammy introduced him to using drugs, that she broke his arm, that she tried to smother him, and physically abused him. Tammy vehemently denied all these allegations. There is no evidence any of this occurred other than Tim's statement. The Court found Tammy's testimony to be more credible than his. "Cases involving undue influence will frequently depend on the credibility of witnesses," <u>Higgs v. Estate of Higgs</u>[8] and <u>Pyle v. Sayers</u>.[9]

In this case Tim is not credible. He even told his therapist that, he lied to them all the time. . . . Furthermore, Tim contradicted himself throughout his therapy sessions. For example, he claimed in one session he never threatened his siblings or his mother, then

---

[8] 48 Ark. App. 148, 892 S.W.2d 284 (1995).

[9] 344 Ark. 354, 39 S.W.3d 774 (2001).

later he states that if he did threaten his mother he doesn't remember it. He stated that Tammy introduced him to drugs at age (10), then later he stated his brother was the one who introduced him to drugs, he later said he was (9) years old when he started using. Tim was so untruthful that he attempted to water his drug test.

Tim Simpson slowly gained control over Edith Simpson by scaring her with his tirades, by telling her lies about his siblings, by isolating her from her family, by stealing her medications, eventually getting her to stop using Tammy for accounting work. She was so afraid of Tim that she didn't want him to know she was talking to his siblings on the telephone.

However, the single most telling piece of evidence in this trial was Tim Simpson's statement to his Therapist that his mother had changed her Will, leaving everything to him. The therapist's notes state, "Client was becoming verbally aggressive in the way he told about his family and how he was glad he **screwed** them out of everything."

Webster's New World Dictionary, 3rd Edition defines "screw" as to practice extortion on; to cheat, to swindle, to treat unfairly. Tim would not have made such a statement if the Will change was Edith's idea and free will. He basically admitted what he had done. Edith was elderly, on medications, her resolve was weakened, and after his arrest, she stated she didn't care if she lived anymore.

Though there is no direct evidence that Tim Simpson procured the Will, there is plenty of evidence that he slowly and methodically exerted control and undue influence over her causing her to exclude her other children, including the children who had helped her to most and whom she had been closest to prior to Tim's supposedly drug induced fits and ultimate control. Just as a murder case does not require direct proof, neither does undue influence.

As for the burden of proof in this case, the court stated:

In this particular case, as relates to the burden of proof, it does not matter whether Tim procured the Will or whether he was in a confidential relationship or whether the burden shifted, as this Court finds that the opponents of the Will have met their burden of proving that Tim Simpson exercised undue influence over the mind of Edith Simpson causing her to change her Will and leave him (700) acres of prime farmland and approximately $900,000.00 to the exclusion of those children she was closest to.

This evidence of undue influence was not met, overcome or rebutted by the proponents of the Will. The only evidence they produced to that effect, was Tim's

22

testimony which this Court did not find to be credible, and Skip Mooney's testimony regarding the telephone conversation with Edith, regarding why she wanted to change the Will.

The court concluded that appellant's admission that he screwed appellees out of everything; coupled with appellant's drug use, lies and violent bursts directed toward or in front of his elderly and ill mother; along with Edith's statements regarding her fear of what appellant might do if she did not comply with his directives and her need for anti-depressants two to three months before the will was changed "painted a picture of an elderly, sick frightened woman, who complied with what ever [appellant] wanted in order to avoid further tension and outbursts and possible harm to her other children or [appellant] hurting himself." The court set aside the May 8, 2006 will and denied probate because it found that the will was the product of undue influence exercised by appellant. Appellant filed a post-trial motion to vacate. The court did not act on the motion. Appellant filed his notice of appeal on October 29, 2012. This appeal followed.

Appellant argues that the trial court erred by setting aside the May 8, 2006 will because there was no direct or presumptive undue influence. More specifically, appellant argues (1) that he had no direct influence over the will's production or execution, and (2) that he neither procured the will nor was he in a confidential relationship with his mother.

We review probate proceedings de novo; however, we will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence, giving due deference to the superior position of the trial judge to determine the

credibility of the witnesses and the weight to be accorded their testimony.[10]  A finding is clearly erroneous when, although there is evidence to support it, the appellate court is left on the entire evidence with a firm conviction that a mistake has been committed.[11]

It has long been the law in Arkansas that a party challenging the validity of a will must typically prove by a preponderance of the evidence that the testator lacked the requisite mental capacity or that the testator was the victim of undue influence when the will was executed.[12]  The questions of undue influence and mental capacity are so closely interwoven that they can be considered together.[13]  The influence that the law condemns is not the legitimate influence that springs from natural affection, but the malign influence that results from fear, coercion, or any other cause that deprives the individual of her free agency.[14]  Undue influence may be inferred from the facts and circumstances of a case.[15]  Cases involving undue influence will frequently depend on witness credibility.[16]  If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in her memory, without prompting, the extent and condition of her property, and to comprehend how she is disposing

---

[10] *Pyle, supra.*

[11] *Wilson v. Lindvall*, 2013 Ark. App. 364, ___ S.W.3d ___.

[12] *Id.*

[13] *Hooten v. Jensen*, 94 Ark. App. 130, 227 S.W.3d 431 (2006).

[14] *Id.*

[15] *Id.*

[16] *Pyle, supra.*

of it, and to whom, and upon what consideration, then she possesses sufficient mental capacity to execute such instrument.[17] Where the mind of the testatrix is strong and alert, the facts constituting undue influence must be stronger than where the mind of the testatrix is impaired either by some inherent defect or by the consequences of disease or advancing age.[18] The influence of children over parents is legitimate so long as they do not extend a positive dictation and control over the mind of the testatrix.[19]

There are certain circumstances that will cause the burden of proving undue influence to shift to the proponents of a will. One example of this is where a beneficiary procures the will. Procurement of a will requires actual drafting of the will for the testator or planning the testator's will and causing him to execute it.[20] Procurement shifts the burden to the proponent of the will to show beyond a reasonable doubt that the will was not the result of undue influence and that the testator had the mental capacity to make the will.[21] The existence of a confidential relationship between a primary beneficiary and a testator gives rise to a rebuttable presumption of undue influence.[22] If a confidential relationship exists, the beneficiary and proponent of the will is required to prove by a preponderance of the evidence

---

[17] *Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984).

[18] *Pyle, supra.*

[19] *Id.*

[20] *Bell v. Hutchins*, 100 Ark. App. 308, 268 S.W.3d 358 (2007).

[21] *Id.*

[22] *Medlock v. Mitchell*, 95 Ark. App. 132, 234 S.W.3d 901 (2006).

that he did not take advantage of the relationship such that the will was the product of undue influence and not the result of the testator's own volition.[23] Whether two individuals have a confidential relationship is a question of fact.[24]

Here, the trial court found that Edith probably had the requisite mental capacity to execute a will and that there was no direct evidence that appellant exerted control over Edith's mind causing her to draft a new will leaving everything to him. However, relying on the supreme court in *Hyatt v. Wroten*,[25] the court acknowledged that undue influence is difficult of direct proof because it is usually exercised in secret. The court considered all of the testimony and evidence and concluded that Edith's 2006 will was the result of undue influence. In making this determination, the court stated that regardless of whether appellant procured the will or was in a confidential relationship with Edith, appellees met their burden and appellant did not overcome their proof. Additionally, the court found that appellant was not credible. From our review of the evidence, we cannot say that the court's finding that appellant exerted undue influence over Edith is clearly erroneous. Accordingly, we affirm.

Affirmed.

GLADWIN, C.J., and WOOD, J., agree.

*Dover and Zolper*, by: *Dennis M. Zolper*; and *Chrestman Group, PLLC*, by: *Keith L. Chrestman*, for appellant.

*Dick Jarboe*, for appellees.

---

[23] *Id.*

[24] *Id.*

[25] *Supra.* To the extent that appellant attempts to distinguish this case from *Hyatt*, we find his distinguishment unavailing and without merit.