

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-16-1148

| | |
|---|---|
| LAURA L. GRAHAM, INDIVIDUALLY AND AS BENEFICIARY OF THE SAMUEL R. LUDINGTON, JR., REVOCABLE LIVING TRUST AGREEMENT U/D DECEMBER 8, 2006 **APPELLANT** | **Opinion Delivered:** October 4, 2017 <br><br> APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66FCV-15-409] |
| V. | |
| LANA LOUISE UNDERWOOD, TRUSTEE AND BENEFICIARY OF THE SAMUEL R. LUDINGTON, JR., REVOCABLE LIVING TRUST AGREEMENT U/D DECEMBER 8, 2006 **APPELLEE** | HONORABLE JAMES O. COX, JUDGE <br><br> AFFIRMED |

**BART F. VIRDEN, Judge**

Appellant Laura Graham filed a complaint against her sister, appellee Lana Underwood, to cancel amendments their now deceased father, Samuel R. Ludington, made to a trust agreement. Graham alleged that the amendments were the product of undue influence by Underwood. Underwood filed a motion for summary judgment. Following a hearing, the Sebastian County Circuit Court granted summary judgment to Underwood and granted Underwood's motion to strike affidavits that were untimely submitted by Graham. Graham argues that the trial court abused its discretion in not allowing further evidence and that summary judgment was inappropriate. We affirm.

## I. *Background and Procedural History*

Samuel (Sam) and Elizabeth Ludington have two children, Graham and Underwood. On December 8, 2006, Sam executed a revocable living trust agreement, which provided that, if Elizabeth predeceased him, the daughters would receive equal shares of his estate. On July 31, 2013, Sam amended the trust to make a specific devise of all his stock in Eastern Tank Services, Inc., and Johnson County Disposal Well Services, Inc., to Underwood. Elizabeth died suddenly on August 22, 2013.

Sam made a second amendment to the trust on December 19, 2013, to direct that his Sandalwood Apartments property be sold and the proceeds distributed in the following manner: one-half to Underwood "outright and free of trust"; one-sixth to the trustee of the Laura Lynn Graham Trust; and one-sixth to the trustees of trusts set up for each of Graham's two daughters.[1] Sam died on April 3, 2014.

Graham filed a complaint against Underwood on May 1, 2015, alleging that Underwood had exercised undue influence over Sam to amend the trust agreement. Specifically, she alleged that she and Sam had a good relationship, that Sam was greatly affected by his wife's death and was influenced by Underwood to execute amendments changing the distribution "basically all to [Underwood]," that Underwood was "very forceful, and Sam was in deep distress over his wife's death, as they were very close," and that Underwood "constantly misrepresented Laura's actions to Sam and harassed him to execute the Trust Amendments." Underwood answered the complaint, generally denying

---

[1]Sam amended his trust for a third time on January 2, 2014, altering the succession of trustees.

the allegations, pointing out that Elizabeth was still living at the time Sam made the first amendment, and asserting that it was well known that Sam did not approve of Graham's "lifestyle and some of her life choices."

Underwood then moved for summary judgment and attached to her motion deposition testimony of Graham and Polly Lawson, Sam's business partner. In her response to Underwood's motion, Graham submitted exhibits including, among other things, deposition testimony from her, Underwood, Underwood's husband Delbert, and Lawson; affidavits from Don and Debbie Bradshaw; and memos and handwritten notes from attorney Randy McGinnis, who had assisted Sam with his estate planning. On May 4, 2016, a hearing was held on Underwood's motion.

## II. *Evidence Supporting and Opposing Summary Judgment*

In Graham's deposition, she said that Underwood had been very forceful and controlling all of her life, that Underwood had harassed their parents her whole life to get what she wanted, that she nagged and bullied their parents, and that she would yell, throw fits, and threaten to make their parents' lives miserable.

Graham conceded that Sam had told her that he wanted Underwood to take over as the owner of Eastern Tank when he died and that she knew why. She explained, "I have a master's degree in English and I like to teach college. I like to write books. He knows that. He understood my passion. She wanted to run his company, Eastern Tank."

Graham testified that she was not aware of any of the amendments to Sam's trust at the time they were made. Graham said that, although her mother had told her that

Underwood was trying to persuade Sam to change his will, she had no personal knowledge that Underwood had unduly influenced their father. Graham was asked,

> Q: So you never saw [Underwood] do anything that you would consider to be—to have unduly influenced [Sam] to sign the first, second or third Amendment?
>
> A: All I know is her behavior our whole lives. I don't see why her behavior would have changed in that moment.
>
> Q: So you—would it be fair to say it like this, you're firmly convinced that Lana unduly influenced your father to do the first, second, and third Amendments, you just don't know specifically how she did it?
>
> A: Absolutely.

Graham stated that the only evidence she had that Underwood unduly influenced their father was the fact that Underwood "totally isolated [her] from [Sam]." Graham conceded that she called her father every day and traveled to see him as often as she could, but she insisted that she was not "able to get near him." Graham asserted that Lawson was present when Underwood influenced, persuaded, and forced Sam to change the trust agreement.

Polly Lawson testified that Sam feared that Elizabeth would sell everything if he predeceased her. She said that Eastern Tank was Sam's "legacy" and that Underwood became his succession plan for the company. According to Lawson, Sam's relationship with Graham was "non-existent," and Lawson claimed that Sam was angry when he discovered that Graham had gotten a degree in English because he thought he had paid for a four-year degree in accounting. Lawson said that Graham had never gotten a job and that Sam "totally" supported her. She said that Sam had "an incredible work ethic" and that Graham

was a disappointment. Lawson said that she had not personally seen Underwood influence Sam with anything and that she did not think Sam would have been susceptible to that.

In Underwood's deposition, she stated that she began working at Eastern Tank in 2006. She said that, although her father had mentioned his estate plan to her, they did not discuss it because she did not want to talk about it and that she had learned from her mother that Sam planned to leave his Eastern Tank stock to her. Underwood insisted that she did not ask, pressure, or coerce Sam to make any changes to his trust; that she did not take Sam to his lawyer's office to change his estate plan or make an appointment for him to do so; and that she did not do anything to cause Sam to fear her.

In Debbie Bradshaw's affidavit, she attested that Sam is her cousin and good friend; that she had worked at Sam's businesses; and that she and her husband had often dined with Sam and Elizabeth. She said that Sam had expressed that he loved his daughters equally and had helped both daughters with certain expenses. Mr. Bradshaw's attestations were similar. Mrs. Bradshaw further stated that

> 7.  I observed Sam's interaction with Lana over the years and saw her "charm and influence" him. She named her son after him.
>
> 8.  Several times I heard Lana talk to Sam badly about Laura.
>
> 9.  Lana told me that she told Sam that after Elizabeth's funeral that someone had "ransacked" Elizabeth's and Sam's home looking for property. I know that this was untrue.
>
> 10. I saw Lana try to "con" Sam out of property or cash.
>
> . . . .
>
> 12. I saw Lana's action to "overtake Sam's mind" after Elizabeth's death.

In a memo dated August 28, 2013, attorney McGinnis noted that Elizabeth had suddenly died and that Sam's health was not good. He said that he had received an unexpected visit from Underwood and her husband, who had relayed to him that Graham and her boyfriend had come to Fort Smith and were "essentially ransacking" the Ludingtons' home looking for assets, valuables, and cash.

In a memo dated October 2, 2013, McGinnis noted that Lawson had called to say that Sam was back in the hospital and that she

> advised me that Sam has now learned how his daughter Laura ransacked the house after Elizabeth's funeral. That obviously has him very upset and he is looking at further ways to restrict Laura's inheritance as well as her control. He has already executed new powers of attorney to remove any authority Laura has to make decisions with regard to finances and property as well as with regard to healthcare decisions for him. We were also in the midst of drafting some changes to his trust to create a trust for Laura and her share of his estate that he intends for her to receive. There may be some more change to that and I need to talk with Sam about that.

At the conclusion of the May 4, 2016 hearing, Graham's counsel requested one week to supplement his response, which the trial court granted. On May 26, 2016, Graham filed a motion to extend the time to submit further evidence and attached additional affidavits from the Bradshaws dated May 20, 2016, which Graham asserted contained newly discovered evidence. Underwood moved to strike the evidence as untimely submitted.

On July 20, 2016, the trial court entered an order granting Underwood's motion to strike the affidavits and her motion for summary judgment. Graham now appeals to this court from that order.



III. *Discussion*

A. Motion to Strike Affidavits

Trial courts have considerable discretion in the control and management of proceedings before them. *Lagios v. Goldman*, 2016 Ark. 59, 483 S.W.3d 810. Trial courts have broad discretion to reopen a case for further proof after both sides have rested, particularly to "ascertain the truth of the matter to be determined" on a material issue. *Id.* at 14, 483 S.W.3d at 821. The timetable of Arkansas Rule of Civil Procedure 56(c) controls unless the court grants an extension. Here, Graham was granted one week in which to supplement her response.

The Bradshaws' first affidavits were prepared in January 2016. The hearing on Underwood's motion for summary judgment was held on May 4, 2016. The second affidavits by the Bradshaws were witnessed on May 20, 2016, and attached to a motion to extend time filed on May 26, 2016. The trial court struck the second affidavits.

Graham argues that the trial court abused its discretion in not allowing further evidence as to the credibility of witnesses on the issue of undue influence. According to Graham, the Bradshaws' second affidavits dealt with conversations they had with Lawson in April 2016, which directly contradicted deposition testimony by Lawson and Underwood.

The trial court could have found that Graham did not demonstrate good cause for permitting the untimely affidavits. The affidavits referred to discussions the Bradshaws had with Lawson before the one-week extension had expired. The affidavits were filed more than one week after the hearing had ended and were thus untimely filed. We cannot say that the trial court abused its discretion in striking the affidavits under these circumstances.

### B. Motion for Summary Judgment

Our standard of review for summary-judgment cases is well established. *Anderson v. CitiMortgage, Inc.*, 2014 Ark. App. 683, 450 S.W.3d 251. Summary judgment should be granted only when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Id.* The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. *Id.* We no longer refer to summary judgment as a drastic remedy and now simply regard it as one of the tools in a trial court's efficiency arsenal. *Id.* Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items leave a material fact unanswered. *Id.* We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.* Moreover, if a moving party fails to offer proof on a controverted issue, summary judgment is not appropriate, regardless of whether the nonmoving party presents the court with any countervailing evidence. *Id.*

The capacity required to create, amend, revoke, or add property to a revocable trust is the same as that required to make a will. *Harbur v. O'Neal*, 2014 Ark. App. 119, 432 S.W.3d 651. The test to determine whether a will is the product of undue influence is the same for a trust that takes effect, in part, at death. *Id.* Every person of sound mind and disposing memory has the untrammeled right to dispose of his or her property by will as he

or she pleases. *Pyle v. Sayers*, 344 Ark. 354, 39 S.W.3d 774 (2001). A testator has the legal right to dispose of his or her property in any manner that he or she sees fit, even if the disposition might appear on its face to be unnatural or inequitable, so long as such disposition expresses the will of the testator. *Breckenridge v. Breckenridge*, 2010 Ark. App. 277, 375 S.W.3d 651. It has long been the law in Arkansas that a party challenging the validity of a will must typically prove by a preponderance of the evidence that the testator lacked the requisite mental capacity or that the testator was the victim of undue influence when the will was executed. *Pyle, supra*.

Graham does not argue that Sam lacked the requisite mental capacity at the times he amended the trust agreement. Thus, we address whether there was a genuine issue of material fact whether Sam was unduly influenced by Underwood to make the amendments. Where the mind of the testator is strong and alert, the facts constituting undue influence must be stronger than where the mind of the testator is impaired either by some inherent defect or by the consequences of disease or advancing age. *Simpson v. Simpson*, 2014 Ark. App. 80, 432 S.W.3d 66.

1.   *Undue influence*

The influence that the law condemns is not the legitimate influence that springs from natural affection, but the malign influence that results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property. *Simpson, supra*. Undue influence may be inferred from the facts and circumstances of a case and will frequently depend on the credibility of witnesses. *Id*. The influence of children over parents

is legitimate so long as they do not extend a positive dictation and control over the mind of the testator. *Id.*

We agree with Graham that summary judgment should not be granted if it is necessary to weigh the credibility of statements to resolve an issue. *Gibraltar Lubricating Servs., Inc. v. Pinnacle Res., Inc.*, 2016 Ark. App. 156, 486 S.W.3d 224. It was not necessary to weigh credibility here. Underwood, as the moving party, demonstrated her entitlement to judgment as a matter of law. The deposition of Graham revealed that she knew nothing about the amendments and could not point to a single action by Underwood that could be construed as her having exercised undue influence over Sam to amend his trust. Instead, Graham relied on Lawson to present that evidence, and Lawson said that she saw no undue influence by Underwood and did not think Sam would have been susceptible to such influence.

In her response to Underwood's motion, Graham presented, along with her and Lawson's depositions, deposition testimony from Underwood and her husband. None of the deposition testimony helped Graham. The Bradshaws' January affidavits were general and did not speak to whether Underwood unduly influenced Sam to amend his trust in her favor. As for McGinnis's memos, it is unclear from the August 28 memo whether McGinnis relayed to Sam Underwood's accusations that Graham and her boyfriend had ransacked the Ludingtons' home. In the memo dated October 2, McGinnis indicated that Lawson said Sam had been made aware of the ransacking, which angered him, but the memo does not disclose how Sam had been made aware, i.e., whether it was Underwood's doing.

If a moving party supports his or her motion for summary judgment by making a prima facie showing of an absence of factual issues and entitlement to judgment as a matter of law, and the adverse party fails to set forth specific facts showing a genuine issue of material fact, then the appellate court will not say the trial court erred in granting summary judgment. *Pyle v. Robertson*, 313 Ark. 692, 858 S.W.2d 662 (1993). Graham did not meet proof with proof necessary to survive a summary-judgment motion, and we thus affirm the trial court's granting of summary judgment to Underwood.

## 2. *Confidential relationship*

The existence of a confidential relationship between a primary beneficiary and a testator gives rise to a rebuttable presumption of undue influence. *Breckenridge, supra*. If a confidential relationship exists, the beneficiary and proponent of the will is required to prove by a preponderance of the evidence that he or she did not take advantage of the relationship such that the will was the product of undue influence and not the result of the testator's own volition. *Id.* A confidential relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. *Lucas v. Grant*, 61 Ark. App. 29, 962 S.W.2d 388 (1998). Relationships deemed to be confidential are not limited to those involving legal control; they also arise whenever there is a relation of dependence or confidence, especially confidence that springs from affection on one side and a trust in reciprocal affection on the other. *Id.* A confidential relationship, however, is not established simply because parties are related or live in the same household. *Id.* There is no set formula by which the existence of a confidential relationship

may be determined, for each case is factually different and involves different individuals. *Id.* Whether two individuals have a confidential relationship is a question of fact. *Id.*

Graham argues that Underwood "was in almost daily contact with Sam as she had been for years," that Underwood engaged in "constant, long-term attempts to 'control' Sam," and that Underwood kept Sam isolated from her.

Both parties testified that Underwood was always closer to Sam; there was testimony that Underwood and Sam had worked together; and Sam clearly trusted Underwood to run his businesses. There was no evidence that Underwood had ever advised Sam or acted on his behalf and no evidence that Underwood otherwise sought to control Sam. Although Graham claimed that Underwood "isolated" Sam, Graham herself said that she called her father daily—sometimes twice a day—and visited him as often as she could.

Although the trial court found that there was no confidential relationship, the trial court alternatively ruled that, even if there had been a confidential relationship, Underwood rebutted the presumption of undue influence. We agree. Graham herself knew of no undue influence; Lawson did not witness any undue influence; and Underwood said that she did not discuss Sam's estate planning; she did not ask, pressure, or coerce Sam to make any changes to the trust; she did not facilitate the amendments by putting Sam in contact with his lawyer; and she did not do anything to cause her father to fear her.

IV. *Conclusion*

We hold that the trial court did not abuse its discretion in striking the untimely affidavits. We further hold that summary judgment was appropriate here because Graham could not meet proof with proof by presenting disputed facts related to undue influence.

Affirmed.

GLADWIN and BROWN, JJ., agree.

*Richard F. Hatfield, P.A.*, by: *Richard F. Hatfield*, for appellant.

*Jones, Jackson & Moll, PLC*, by: *Mark Moll* and *Kathryn A. Stocks*, for appellee.